UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 SEP 23  PM 4: 06

CLERK
BY_____
DEPUTY CLERK

SECURITIES & EXCHANGE
COMMISSION,

        Plaintiff,

        v.

CHAD C. McGINNIS, SERGEY PUGACH,
and JANUSZ SUCHOWIEJKO,

        Defendants,

and

BELLA PUGACH,

        Relief Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 5:14-cv-6

**OPINION AND ORDER DENYING DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT**
(Docs. 211, 222, 224, 228)

        Plaintiff Securities & Exchange Commission (the "SEC") brings this action
pursuant to Section 10(b) of the Securities Exchange Act of 1934 ("the Act") and Rule
10b-5 thereunder, 15 U.S.C. § 78j(b), and Section 17(a) of the Act, 15 U.S.C. § 77q(a),
against Chad C. McGinnis, Sergey Pugach, and Janusz Suchowiejko (collectively, the
"Defendants").

        In Count One of its First Amended Complaint, the SEC alleges that Defendants
violated Section 10(b) of the Act and Rule 10b-5 by obtaining material nonpublic
information and misappropriating or otherwise misusing that information in breach of a
fiduciary duty, or other duty arising out of a relationship of trust and confidence, in order
to make profits by trading or tipping others.  (Doc. 128 at 18-19.)  In Count Two, the
SEC asserts that Defendants violated Section 17(a)(1)-(3) of the Act in connection with

the offer or sale of a security. *Id.* at 19-20.[1]  According to the SEC, Defendants violated the Act from 2010 until July of 2013 when Mr. McGinnis was terminated from employment at Keurig Green Mountain ("KGM").[2]

Pending before the court are four motions for summary judgment.  Mr. McGinnis moves for partial summary judgment with respect to the SEC's claims against him based on his alleged conduct during the years 2010, 2011, and 2012.  (Doc. 211-2.)  He contends that the SEC cannot establish that he possessed material nonpublic information during those years.  Mr. McGinnis also filed a separate motion for summary judgment, arguing that the court should relieve him of liability for damages stemming from Mr. Pugach's and Mr. Suchowiejko's KGM trading profits pursuant to *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014).  (Doc. 228.)

Mr. Pugach and Mr. Suchowiejko move for partial summary judgment in a joint conditional motion, arguing that if the court grants Mr. McGinnis's motion for partial summary judgment pertaining to the 2010-2012 time frame, it must also enter judgment in their favor because the SEC has not alleged that either Mr. Pugach or Mr. Suchowiejko received material nonpublic information from anyone other than Mr. McGinnis.  (Doc. 224.)  The SEC agrees that if Mr. McGinnis prevails on his motion for partial summary judgment, Mr. Pugach's and Mr. Suchowiejko's joint conditional motion should be granted.  Mr. Suchowiejko moves separately for summary judgment, arguing that the SEC cannot establish that he knew or should have known that he received material nonpublic information.  (Doc. 222.)

The SEC opposes all of the motions except the joint conditional motion for the reason previously noted.  It argues that a forensic analysis of Mr. McGinnis's use of his KGM computer in 2013 reveals that he repeatedly accessed KGM's material nonpublic

---

[1] Section 17(a) of the Act uses similar terms as Rule 10b-5 but applies only to the "offer or sale" of securities and renders it "unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to employ any device, scheme, or artifice to defraud[.]"  15 U.S.C. § 77q(a)(1).

[2] KGM is also referred to herein as Green Mountain Coffee Roasters ("GMCR").

2

information and that this evidence is admissible in the court's consideration of the pending motions. Mr. McGinnis counters that the 2013 evidence is inadmissible as "propensity" evidence under Fed. R. Evid. 404(b).

The court heard oral argument on May 12, 2015. At the parties' request, the court permitted additional briefing on the issue of whether the SEC's 2013 forensic evidence is admissible in analyzing the events that took place in 2010-2012. These filings were completed on July 13, 2015, at which time the court took the pending motions under advisement.

The SEC is represented by Dugan Bliss, Esq., James A. Scoggins, Esq., and Gregory A. Kasper, Esq. Mr. McGinnis is represented by Michael Q. English, Esq. and Kevin M. Henry, Esq. Mr. Pugach is represented by Alan J. Sobol, Esq., Edward B. Lefebvre, Esq., Megan Youngling Carannante, Esq., and Craig S. Nolan, Esq. Mr. Suchowiejko is represented by Maryanne E. Kampmann, Esq.

## I.    The Undisputed Facts.

### A.    Mr. McGinnis's KGM Employment.

In late 2006, Mr. McGinnis began working for KGM as an information technology employee, designing and developing KGM's SharePoint sites. From 2010 through July of 2013, he managed a team of KGM employees who were responsible for all of KGM's SharePoint sites. During that time period, KGM stored its draft SEC filings, press releases, and information associated with its quarterly earnings reports in a folder within the Finance/Private shared folder tree (the "Finance/Private folder"). Mr. McGinnis did not have access to the Finance/Private folder using his own username and password. He was, however, able to utilize the "super user" Batchops login and password, which provided access to all of the files and folders within the KGM network file share system. In addition, KGM had a password protected service account called User-A which was used to run software services.

During the time period between 2010 until November of 2012, KGM did not monitor access to the Finance/Private folder. There is no evidence that Mr. McGinnis

was seen improperly viewing KGM's material nonpublic information during the 2010-2012 time period.

In the course of his KGM employment, Mr. McGinnis received stock options as part of KGM's employee stock purchase program. Shortly after commencing his employment at KGM, he began researching KGM's stock, including publicly available information, but he did not purchase any proprietary research, or have access to the kinds of resources that professional traders and money managers would have, such as a Bloomberg terminal. Between 2010 and July of 2013, KGM was an "extremely volatile" stock, and its price moved at least 9.38% after twelve of the thirteen at-issue earnings announcements. (Doc. 211-1 at 4, ¶¶ 28-29.) The parties agree that, due to the significant stock price volatility, hedging was a viable options trading strategy for KGM's securities around earnings announcements.

From 2010 through 2013, Mr. McGinnis actively traded KGM securities, as well as non-KGM securities such as Apple and Google. During this time period, KGM periodically made earnings announcements that were available to the general public. Mr. McGinnis traded 42% more dollars in KGM securities outside of the earnings announcements than he did during the days immediately preceding earnings announcements. He also invested 40% more dollars in Apple securities than he did in KGM earnings announcement trades. Although Mr. McGinnis both made and lost money on his trading during the 2010-2013 time period, he made over $2,000,000 on his KGM earnings announcement trades and approximately $70,000 on his KGM non-earnings announcement trading, while on the whole losing money on his non-KGM trading.

In November of 2012, KGM began tracking access to its SharePoint site. The SEC proffers a forensic report by Daniel L. Regard II, Managing Director of Intelligent Discovery Solutions, Inc.,[3] (the "Regard Report") that purports to show that, in 2013, Mr.

---

[3] Intelligent Discovery Solutions, Inc. is "an expert services and consulting firm that provides independent expert testimony and analysis, original authoritative studies, and strategic consulting services to the business and legal community." (Doc. 240-9 at 1-2.) Mr. Regard is an electronic technology specialist with more than twenty years of experience providing expert analysis on

McGinnis repeatedly used the Batchops super user login as well as his regular login to access KGM's material nonpublic earnings information. The Regard Report further purports to show that Mr. McGinnis repeatedly accessed the home page of the KGM Sales Portal, where KGM stored certain material nonpublic financial documents such as "two key sales metrics: how KGM's in-home sales compare to the prior year's sales, and how they compare to the current year's budget." (Doc. 239 at 8.) On two specific occasions, the Regard Report allegedly shows that "Mr. McGinnis also viewed other charts on the Sales Portal home page, tracking sales of specific product lines at KGM, including the K-Cup," *id.*, and that Mr. McGinnis viewed material on the Sales Portal hours before making trades prior to KGM's May 8, 2013 earnings announcement.

### B. The Relationship Between Mr. McGinnis and Mr. Pugach.

Mr. McGinnis and Mr. Pugach attended the same college, worked together at the same employer in the early 2000s, and are "very good friends," as are their spouses. (Doc. 243-2 at 3.) Mr. Pugach served as a groomsman in Mr. McGinnis's wedding and has performed some work around Mr. McGinnis's house. They have exchanged gifts on special occasions such as weddings, baby showers, and birthdays, including a ratchet set, a small collectible coin, a financial wedding gift of $300, and a baby stroller. (Doc. 243 at 4, ¶ 13.) Mr. Pugach provided Mr. McGinnis with market information generally through Facebook communications, as well as particular investment advice on gold and companies such as Cliffs Natural Resources Inc. and Apple. *Id.* at 6-7, ¶¶ 19-21. In addition, Mr. Pugach proposed that he and Mr. McGinnis "open[] a franchise hotel" and suggested other "different businesses" that might provide them with the highest "return on equity." *Id.* at 7, ¶ 20; Doc. 243-4 at 28.

After leaving his regular employment, Mr. Pugach became self-employed as a day trader of KGM and other securities. Starting in or about 2010, he and Mr. McGinnis shared their research and views on KGM "religiously" and used Facebook to discuss KGM trades. (Doc. 211-1 at 4, ¶ 21.) Between 2010 and 2011, Mr. McGinnis and Mr.

issues including electronic discovery, computer forensics, database development, and application software and data analysis.

Pugach observed KGM's quarterly earnings announcements separately. In 2012, Mr. Pugach began travelling to Vermont to observe the earnings announcements with Mr. McGinnis in the latter's home. Between January 24, 2010 and February 24, 2013, Mr. McGinnis and Mr. Pugach communicated by phone call or text message 116 times. Of those contacts, ninety occurred within two days of a KGM earnings announcement, with twenty-five occurring before and sixty-five after.

The SEC has not discovered any text messages from the 2010-2013 time period in which Mr. McGinnis and Mr. Pugach discussed KGM's material nonpublic information. The contents of the phone calls between Mr. McGinnis and Mr. Pugach for the relevant time period were not recorded or otherwise preserved.

C.      **The Relationship Between Mr. Suchowiejko and Mr. Pugach.**

In 2010, Mr. Suchowiejko earned an MBA from the University of Chicago, and he is currently employed as a Management Information Manager at a Connecticut corporation. Since the 2000 or 2001 time period, he has invested in securities. The wives of Mr. Suchowiejko and Mr. Pugach are related through marriage, and in mid-2010 they reestablished an acquaintance after Mr. Suchowiejko and his wife moved to Connecticut. After mid-2010, Mr. Suchowiejko and Mr. Pugach socialized and corresponded via email about investment strategies and video gaming. Mr. Suchowiejko was aware that Mr. Pugach knew two individuals at KGM, and he asked Mr. Pugach to "pass a resume of a friend up the food chain in GMCR[.]" (Doc. 262 at 2.) In response to this request, Mr. Pugach forwarded the resume to a KGM information technology manager he had met at a party. Mr. Suchowiejko and Mr. McGinnis both assert that they did not know each other during the relevant time period, and that neither had heard the other's name.

In or about July or August of 2010, Mr. Pugach recommended KGM as a good investment prospect to Mr. Suchowiejko, who performed his own research and began trading in KGM securities in October of 2010. Mr. Suchowiejko regarded Mr. Pugach as a successful trader who thoroughly researched and tracked his investments fulltime, which Mr. Suchowiejko did not have time to do. He testified in his deposition that he

6

"used the recommendations of Mr. Pugach at times, . . . so to the extent he's done research [] that's helped me." (Doc. 262-1 at 15.) Mr. Suchowiejko, however, did not take Mr. Pugach's advice regarding companies other than KGM. All of Mr. Suchowiejko's trades in KGM were made in his pension account. He conceded that, with regard to this account, he was "[d]efinitely more" willing "to take on risky activity" with a "relatively high [amount] . . . probably 20, 30 percent" of his net worth. (Doc. 222-3 at 9.)

On December 2, 2010, Mr. Pugach emailed Mr. Suchowiejko and invited him to come to his house to view a new video game. Two days later, Mr. Suchowiejko went to Mr. Pugach's house, during which time they "probably discussed Green Mountain[.]" (Doc. 245-1 at 12.) On December 6, 2010, both men invested in similar KGM call options. On December 8, 2010, one day before an earnings announcement, Mr. Pugach emailed Mr. Suchowiejko that the "game got a little worse[,]" and that he "might stop playing for [a] couple of days." (Doc. 245-2 at 2.) Thereafter, both men reversed position and avoided losses. One week later, Mr. Pugach sent an email asking "You back in?" *id.*, which Mr. Suchowiejko understood as a question about whether he had resumed buying KGM securities. (Doc. 245-1 at 12.)

On July 23, 2011, Mr. Pugach emailed Mr. Suchowiejko, again stating that he wanted to show him another video game in person. On July 25, 2011, they "discussed [in person] investments, games, kids, . . . all the things [they] have in common." (Doc. 245-1 at 14.) On July 26, 2011, one day before a KGM earnings announcement, both invested in similar KGM options and subsequently made a profit.

Prior to the February 1, 2012 earnings announcement, Mr. Suchowiejko and Mr. Pugach convened for the stated purpose of sharing a video game. On January 24, 2012, Mr. Pugach emailed Mr. Suchowiejko, told him he would be away for two weeks starting on January 26, 2012, and invited him over to play video games. On January 25, 2012, they met and discussed analysts' estimates for KGM's upcoming earnings and Mr. Pugach's views on the company, but Mr. Pugach did not tell Mr. Suchowiejko that a KGM insider had advised him regarding material nonpublic information. *Id.* at 15.

7

Thereafter, Mr. Pugach and Mr. Suchowiejko invested in similar KGM call options, and both made a profit.

## II.   The Disputed Facts.

The parties dispute whether Mr. McGinnis knew the location of and in fact accessed KGM's material nonpublic information during the years 2010-2012. Relying on the 2013 forensic evidence allegedly revealing that, in 2013, Mr. McGinnis used the Batchops super user login and password to access the Finance/Private folder containing earnings statements, the SEC contends that Mr. McGinnis knew the location of KGM's earnings information prior to 2013, had access to material nonpublic information, and accessed information in the Finance/Private folder and on the Sales Portal in the days leading up to KGM's earnings announcements in 2010-2012.

In addition to Mr. McGinnis's ability to access material nonpublic information through the Batchops super user login, the SEC contends that Mr. McGinnis was able to use his regular login to access KGM's material nonpublic information through KGM's Sales Portal. The SEC contends that tracking software that was installed in November of 2012 shows that Mr. McGinnis repeatedly accessed the home page of the KGM Sales Portal which provided a charge of KGM's in-home sales as compared to the prior year's sales and as compared to budgeted sales. The SEC cites evidence that Mr. McGinnis has admitted to violating KGM's insider trading policy in at least four different ways.

Even without the 2013 forensic evidence, the SEC claims Mr. McGinnis has acknowledged that he had access to KGM's material nonpublic information. The SEC points out that when Mr. McGinnis commenced his employment at KGM, he signed a New Employee Confidentiality Agreement which stated that he would "have access to proprietary and confidential information" including "Financial information, such as costs [and] profits[.]" (Doc. 240-8 at 1.) The SEC further points out that throughout his employment at KGM, "Mr. McGinnis had broad access to the [KGM] network as a result of his knowledge of a domain administrator account" (Doc. 240-9 at 2) and cites evidence that Mr. McGinnis knew the password to the Batchops domain administrator account as early as January of 2007. *Id.* at 7.

8

Mr. McGinnis, in contrast, asserts that he did not have access to KGM's sensitive financial data as part of his work at KGM, that he did not know the location of KGM's earnings information, and that this information was not generally available to KGM employees. He contends that he consistently reaped profits by trading outside of KGM's earnings announcement periods between October 29, 2010 and July 9, 2012 and from January 2013 to July 2013.

The parties agree that KGM stock appreciated 7,895% over a ten year period ending in 2009 which is prior to the conduct alleged in this case. The SEC contends that between January 2010 and June 2013, KGM's stock appreciated only 181% while Mr. McGinnis's return during this same time period was 8,717%. It cites the opinion of its expert Michael G. Mayer[4] who opines that:

> I understand that [Mr. McGinnis and Mr. Pugach] didn't purchase any proprietary research, or have access to the kinds of resources that professional traders and money managers would have, such [as] a Bloomberg terminal. Also, [Mr.] McGinnis had a full time job on top of following [KGM]. While the Defendants have cited that they carefully followed [KGM] as a basis for their extraordinary returns, in fact they were trading at an informational, educational, experience, support, and time disadvantage to market professionals who regularly trade the sophisticated options Defendants traded. Without any real investment background and training, each Defendant managed to get returns that wildly exceed[ed] full time investment professionals. This is highly unusual.

(Doc. 240 at 5, Disputed Fact 20; Doc. 240-11, Mayer Report at 88.) Mr. McGinnis disputes the SEC's claim that his KGM trading results were "highly unusual."

In addition to disputing the degree and nature of Mr. McGinnis's trading profits and losses, the parties do not agree regarding how particular trading results should be characterized. For example, Mr. McGinnis contends that he suffered significant losses as a result of trading after KGM's May 2012 earnings announcement. The SEC, however,

---

[4] Mr. Mayer is a Chartered Financial Analyst ("CFA") and a Certified Fraud Examiner ("CFE"), as well as a Vice President of Charles River Associates. Charles River Associates "is an international consulting firm providing financial advisory services to businesses, law firms, academic institutions, and government agencies . . . on matters involving business and commercial disputes." (Doc. 240-11 at 4.)

notes that in connection with the May 2012 KGM earnings announcement, Mr. McGinnis
made $839,766.43 and avoided losses of $173,655.52.

 The parties also disagree on the proper characterization of the trading strategy Mr.
McGinnis utilized and whether it was a "straddle," as Mr. McGinnis maintains, or
primarily "directional," as the SEC contends. Mr. McGinnis states he "often" used a
straddle options trading strategy, which effectively hedged long and short options
positions and allowed him to make a profit if the stock moved a certain percentage in
either direction after an earnings announcement. (Doc. 211-1 at 5, ¶ 32.) According to
the SEC, however, Mr. McGinnis primarily traded by making directional predictions that
KGM's stock would go up or down for eleven of the thirteen quarters in question. While
the SEC acknowledges that Mr. McGinnis used a strangle strategy in the other two
quarters, it nevertheless asserts that the strangles were directional in nature and thus
predicted the direction the stock would move.

 Mr. Suchowiejko contends that he followed Mr. Pugach's advice about investing
in KGM because he thought Mr. Pugach had done extensive research. The SEC disputes
this claim and cites evidence that Mr. Suchowiejko purchased options with similar
expiration dates and strike prices to those of Mr. Pugach as supporting a reasonable
inference that the two men acted in concert. In his deposition testimony, Mr.
Suchowiejko conceded that Mr. Pugach "might have mentioned" his positions in KGM
securities, but explained that his trades were similar to Mr. Pugach's solely because there
was a limited "gamut of instruments one would choose" when investing before an
earnings announcement. (Doc. 245-1 at 5.)

 Finally, the parties dispute whether Mr. McGinnis received a personal benefit
from Mr. Pugach in exchange for allegedly providing him with KGM's material
nonpublic information. The SEC contends that Mr. Pugach provided Mr. McGinnis with
a number of benefits in exchange for material nonpublic information including his
friendship, trading advice, potential business opportunities, and modest gifts. Mr.
McGinnis, on the other hand, asserts that the SEC cannot prove that Mr. Pugach provided
him with anything in exchange for the alleged insider information, "let alone anything of

value or consequence to Mr. McGinnis." (Doc. 228-1 at 5.) Specifically, Mr. McGinnis argues that none of the gifts from Mr. Pugach satisfy the *quid pro quo* necessary for an insider trading claim. The parties also dispute the extent to which Mr. Suchowiejko knew or should have known that Mr. Pugach received insider information in exchange for conferring a personal benefit on a KGM insider.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A fact is 'material' . . . when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks, citations, and footnotes omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)); *SEC v. Obus*, 693 F.3d 276, 290 (2d Cir. 2012) (explaining that the court's obligation on defendant's motion for summary judgment is to "credit the testimony relied on by the SEC and to draw all inferences in its favor.").

### B.    The SEC's Insider Trading Claims.

The SEC alleges that the Defendants illegally traded around KGM's earnings announcements "since the July 28, 2010 earnings announcement[,]" (Doc. 128 at 9, ¶ 25) until the termination of Mr. McGinnis's employment in July of 2013, *id.* at 3, ¶ 6, and "profited by well over $7 million between 2010 and 2013 from these illegal trades." *Id.* at 2, ¶ 1. Section 10(b) of the Act renders it unlawful for a person to use any "manipulative or deceptive device" in connection with the purchase and sale of a security in violation of the SEC's rules. 15 U.S.C. § 78j(b). Rule 10b-5, in turn, prohibits a person from employing "any device, scheme, or artifice to defraud" or engaging in any act that "operates . . . as a fraud or deceit . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

"Under the 'traditional' or 'classical theory' of insider trading liability, § 10(b) and Rule 10b-5 are violated when a corporate insider trades in the securities of his corporation on the basis of material, nonpublic information." *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997). "The 'misappropriation theory' holds that the person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading

purposes, in breach of a duty owed to the source of the information." *Id.* at 652. "The
two theories are complementary, each addressing efforts to capitalize on nonpublic
information through the purchase or sale of securities." *Id.*

In this case, the SEC has alleged insider trading against Mr. McGinnis under both
theories. Pursuant to the classical theory, the SEC claims that Mr. McGinnis, in
connection with his KGM employment, was given access to certain material nonpublic
information on which he "traded and tipped[.]" (Doc. 242 at 18.) With regard to its
misappropriation theory, the SEC claims that Mr. McGinnis misappropriated "other
information of KGM without the company's knowledge or permission, effectively
stealing that information." *Id.*

Before the court addresses whether disputed facts preclude summary judgment in
the moving parties' favor, it must first determine whether the 2013 forensic evidence is
admissible.

## C. Whether the 2013 Forensic Evidence is Part of the Alleged Conduct or "Inextricably Intertwined."

The SEC asserts that the admissibility of the 2013 forensic evidence should not be
analyzed under Fed. R. Evid. 404(b) because it is either part of Mr. McGinnis's charged
conduct or, in the alternative, because it is "inextricably intertwined" with Mr.
McGinnis's conduct during 2010-2012. Mr. McGinnis disputes both of these grounds for
admissibility.

When alleged "other acts" are included in the charged offense, they are considered
part and parcel of it and not subject to Rule 404(b). *See United States v. Quinones*, 511
F.3d 289, 308 (2d Cir. 2007) ("While Rule 404(b) identifies various rationales–notably
excluding propensity–for which evidence of bad acts *other* than those charged in the
indictment may be admitted at trial, the rule has no bearing on the admissibility of acts
that are part of the charged crime."). As the Second Circuit has explained:

Rule 404(b) bars the admission of a defendant's uncharged crimes to prove
propensity to commit the crime charged. An act that is alleged to have
been done in furtherance of the alleged [offense], however, is not an
"other" act within the meaning of Rule 404(b); rather, it is part of the very

13

> act charged. Further, when the other-act evidence is relevant to prove a
> material fact other than the defendant's propensity, it is not barred by Rule
> 404(b).

*United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) (internal citations omitted); *see also United States v. James*, 520 F. App'x 41, 45 (2d Cir. 2013) (ruling that when the alleged act is "part of the very act charged" it is admissible and "not subject to the strictures of Rule 404(b).").

In its First Amended Complaint, the SEC alleges that Mr. McGinnis violated the Act by trading on KGM's material nonpublic information during the 2010-2013 time period. The 2013 time period is thus squarely within the offenses alleged and is not an "other act." As part of the charged offense, the 2013 forensic evidence is therefore admissible without regard to Rule 404(b).[5] Accordingly, in determining whether Mr. McGinnis is entitled to partial summary judgment in his favor, the record before the court is not confined to the years he has selected.

Even if the 2013 time period was not part of the insider trading alleged by the SEC, evidence is not considered "other acts" evidence if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) (quoting *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989)). "Evidence falling within these categories may be admitted without regard to Rule 404(b)." *United States v. Nastri*, 2014 WL 2118427, at *1 (D. Vt. May 21, 2014).

Mr. McGinnis argues that the 2013 forensic evidence is not "inextricably intertwined" with the alleged 2010-2012 acts because "[e]ach alleged violation involves different trades, different [material nonpublic information], different earnings events, and

---

[5] At this juncture, Mr. McGinnis has not moved to strike or moved *in limine* with regard to the 2013 forensic evidence under Fed. R. Evid. 703 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. The court thus proceeds on the assumption that the 2013 forensic evidence is sufficiently reliable for consideration by the finder of fact. In proceeding in this manner, the court does not foreclose Defendants' subsequent challenges to this evidence under Rule 703.

a different time period." (Doc. 271 at 12.)  He argues that "inextricably intertwined" is a "legal theory developed and . . . utilized almost exclusively by prosecutors in criminal cases[,]" *id.* at 13,[6] and that each earnings period must be analyzed as a "distinct and separable claim" on a trade by trade basis. *Id.* at 16.  The cases cited by Mr. McGinnis, however, do not dictate that result.

In *SEC v. Tang*, 2012 WL 10522 (N.D. Cal. Jan. 3, 2012) and *SEC v. Truong*, 98 F. Supp. 2d 1086 (N.D. Cal. 2000), the trial court examined each trade at issue to determine whether the SEC could withstand summary judgment.  Contrary to Mr. McGinnis's contention, in doing so, the court neither held that evidence regarding other trades was inadmissible for this purpose, nor suggested that it was confined to a trade-by-trade analysis in which the history of insider access was disregarded.  Indeed, as the *Truong* court observed: "causation or use [of insider information] may be inferred from circumstantial evidence" and "[a]ny number of types of circumstantial evidence might be relevant to the causation issue[.]"  *Truong*, 98 F. Supp. 2d at 1095 (quoting *United States v. Smith*, 155 F.3d 1051, 1069 (9th Cir. 1998)); *see also SEC v. Burns*, 816 F.2d 471, 474 (9th Cir. 1987) (holding insider trading allegations are "often based on inferences from circumstantial evidence").[7]  Accordingly, neither *Tang* nor *Truong* support a conclusion that the 2013 forensic evidence is inadmissible.

---

[6] As the SEC points out, the "inextricably intertwined" theory has been applied in civil cases as well.  *See, e.g.*, *Hango v. Royall*, 466 F. App'x 30, 33-34 (2d Cir. 2012) (ruling trial court properly admitted evidence of Hango's immigration history in excessive force claim as "inextricably intertwined" or "necessary to complete the story" because it furnished the jury with "a complete story" and "with an explanation of Hango's motivation in resisting the defendants' efforts to deport him.").

[7] Courts routinely hold that fraudulent conduct must be examined in the context in which it is alleged to have occurred.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 204 (2d Cir. 2009) (observing the amount traded in prepay transactions "must be placed in context" to determine whether the investing practice "would . . . have been material"); *SEC v. Roszak*, 495 F. Supp. 2d 875, 883 (N.D. Ill. 2007) (considering expert report analyzing prior acts because it provided "much-needed context to [defendant's] explanations for his stock purchases . . . [and it] will assist the trier of fact in evaluating the plausibility of the explanations offered by" defendant).

In deciding whether the 2013 and 2010-2012 evidence is "inextricably intertwined," a court may consider whether the two time periods "involve[d] the same victim, . . . employed the same means, . . . [and] are relatively close temporally." *United States v. Vilar*, 2008 WL 4178117, at \*3 (S.D.N.Y. Sept. 5, 2008); *cf. United States v. Rajaratnam*, 2014 WL 2696568, at \*3-4 (S.D.N.Y. June 10, 2014) (ruling that insider trading charges involving "Clearwire" and "AMD" stocks were not "inextricably intertwined" with defendant's uncharged trading of "Akamai" stocks and ruling that "[b]ecause the uncharged Akamai trades do not demonstrate that defendant had the knowledge or intent to engage in insider trading, it cannot help establish the knowledge or intent required for the charged conspiracy").

In this case, from 2010 until the termination of Mr. McGinnis's employment in July of 2013, KGM stored certain material nonpublic information in its Finance/Private folder. Throughout the time period alleged, the SEC contends Mr. McGinnis used the Batchops super user login to access the Finance/Private folder and his regular login via the Sales Portal to access KGM's material nonpublic information which he subsequently used in conjunction with KGM trades. Mr. McGinnis's opportunity to access and means of accessing the Finance/Private folder did not materially change between the 2010-2012 and 2013 time periods. The 2010-2012 and 2013 time periods are not only close in time, they are contiguous. KGM securities are the only ones at issue, and Mr. McGinnis's status as a KGM Information Technology employee is the only insider status alleged. These facts weigh heavily in favor of concluding that the two time periods are "inextricably intertwined." The only intervening event is KGM's installation of tracking software in November of 2012.

The instant case is also readily distinguishable from *United States v. Newton*, 2002 WL 230964 (S.D.N.Y. Feb. 14, 2002), which Mr. McGinnis characterizes as "particularly instructive[.]" (Doc. 271 at 14.)

In *Newton*, the trial court found evidence of uncharged fraudulent visa referrals involving other individuals was not "inextricably intertwined" with the charged offense, reasoning that:

16

. . . the activity underlying the evidence the government proffers has no direct involvement with or crucial connection to the charged referrals. While the proffered evidence may tend to show that Newton was engaged in a *pattern* of activity involving the fraudulent procurement of visas, knowledge of that activity does not assist in understanding the charged crimes. The fact that he may have committed similar fraudulent acts in close temporal proximity to the charged crimes furnishes an element of context, but it is certainly not crucial information without which the jury will be confused or the government's theory of the case unfairly curtailed. Nor can it be said that the uncharged and charged crimes arose out of the same transaction or series of transactions. While the activity was similar, these were separate visa referrals made with respect to different individuals at different times. Accordingly, I conclude that the uncharged activity which the government seeks to admit is not "background" evidence but rather "other crimes/acts" evidence that must come in, if at all, under Rule 404(b).

*Newton*, 2002 WL 230964, at *3.

In contrast, the 2010-2012 and 2013 time periods are both part of the charged conduct, the same individual, same company, and same stock is involved, and the 2013 forensic evidence is proffered not to provide evidence of other uncharged offenses, but to show how Mr. McGinnis allegedly possessed KGM's material nonpublic information before KGM's tracking software was installed. The 2013 forensic evidence thus provides a crucial link between the two time periods and is admissible without regard to Rule 404(b).[8] Mr. McGinnis's contention that his conduct in 2013 was significantly different

---

[8] *See United States v. Goffer*, 721 F.3d 113, 126 (2d Cir. 2013) (noting that "[a]fter September 2007, evidence of [defendant's] knowledge of the fraud becomes overwhelming" and ruling that a rational juror could rely on this evidence in concluding that the insider trading also included the July and August of 2007 trades); *see also United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (ruling that trial court properly admitted evidence that defendant possessed a pistol on dates other than those specifically charged because "the challenged evidence was *not* 'other crimes' evidence within the meaning of Rule 404(b). Rather, the evidence was admitted to show that it was [the defendant] and not someone else who exercised continuous dominion and control over the pistol" and this was "inextricably intertwined with the evidence regarding the charged offense") (citation omitted); *United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983) (holding evidence of agent's investigation of stolen motor vehicles, although an uncharged offense, explained the agent's presence and the animosity of the defendant and his associates towards him and was therefore "inextricably linked to the charged offense of assault, was reasonably necessary to complete the story of the crime, and therefore was not extrinsic under Rule 404(b)"); *United States v. Barnes*, 49 F.3d 1144, 1149 (6th Cir. 1995) (affirming district court's

from his conduct during the 2010-2012 time period is "an argument to be made to the jury rather than a ground for exclusion of the evidence by the court." *United States v. Biaggi*, 853 F.2d 89, 106 (2d Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989).

### D. Whether the 2013 Forensic Evidence is Admissible Under Rule 404(b).

"[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." *United States v. Nektalov*, 325 F. Supp. 2d 367, 372 (S.D.N.Y. 2004). Assuming *arguendo* that the 2013 forensic evidence is neither part of the charged offense nor "inextricably intertwined" with Mr. McGinnis's 2010-2012 conduct, the court examines whether the 2013 forensic evidence is admissible under Rule 404(b).[9]

Fed. R. Evid. 404(b) provides that:

> [e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.

The Second Circuit "follow[s] an inclusionary rule, allowing the admission of [404(b)] evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994)). In *Huddleston v. United States*, 485 U.S. 681 (1988), the Supreme Court instructed that evidence is admissible under Rule 404(b) if it: (1) is offered for a proper purpose; (2) is relevant; (3)

---

conclusion that there was a "direct connection" between the earlier drug shipment and the charged conduct because it was "part of a continuing pattern of illegal activity").

[9] Mr. McGinnis concedes that evidence under Rule 404(b) need not predate the charged conduct in order to be admissible. *See United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998) ("The fact that the evidence involved a subsequent rather than a prior act is of no moment"); *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1149 (2d Cir. 1978) ("The proof is admissible even if the acts occurred after the crime charged"); *United States v. Shenker*, 933 F.2d 61, 62-63 (1st Cir. 1991) (admitting evidence of defendant's false answers on subsequently submitted insurance applications as evidence of guilt in insurance fraud prosecution).

is substantially more probative than prejudicial; and (4) can be accompanied by an appropriate limiting instruction to the jury when requested by the defendant. *See id.* at 691-92.

The first inquiry under *Huddleston* is whether the other acts evidence has been offered for a "proper purpose." *Id.* at 691.[10] "[T]he government's purpose in introducing the [other acts] evidence must be to prove a fact that the defendant has placed, or conceivably will place, in issue, or a fact that the statutory elements obligate the government to prove." *United States v. Merriweather*, 78 F.3d 1070, 1076 (6th Cir. 1996). Mr. McGinnis argues that the 2013 forensic evidence has not been offered for a proper purpose because what the SEC seeks to prove in 2010-2012 is his *actions*—that is, whether he accessed KGM's material nonpublic information during this time period. Accordingly, he contends he "has removed [his] knowledge from being 'at issue' by consistently maintaining that he did not possess MNPI [material nonpublic information], never traded on MNPI, and never tipped MNPI to Mr. Pugach." (Doc. 271 at 30.) He makes a similar argument with regard to his intent, his opportunity, and his modus operandi. Mr. McGinnis argues that Second Circuit precedent therefore renders the 2013 forensic evidence irrelevant. This argument is misplaced.

In *United States v. Siddiqui*, 699 F.3d 690, 699 (2d Cir. 2012), the defendant testified in her own defense and asserted that although she was "shot from multiple

---

[10] Under Rule 404(b), other acts evidence may be admitted to prove, among other things, intent, *see United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987) ("Where intent to commit the crime charged is clearly at issue, evidence of prior similar acts may be introduced to prove that intent"); knowledge, *see United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir. 1990) (admitting evidence of drug involvement nine months after the charged offense because it established "knowledge about the contraband concealed within the package"); identity, *see United States v. Sappe*, 898 F.2d 878, 880 (2d Cir. 1990) (ruling evidence of defendant's "distinctive method for robbing banks" properly admitted under Rule 404(b) to establish "proof of identity"); modus operandi, *see United States v. Danzey*, 594 F.2d 905, 911 (2d Cir. 1979) (concluding evidence of defendant's "trademark" when robbing banks was "admissible under [Rule 404(b)] and under our cases to show a modus operandi"); and opportunity, *see United States v. Robinson*, 560 F.2d 507, 513 (2d Cir. 1977) (affirming admission of evidence of defendant's possession of gun because "it tended to show he had the 'opportunity' to commit the bank robbery, since he had access to an instrument similar to that used to commit it").

directions[,]" she "never picked up, aimed, or fired an M-4 rifle" towards Americans whom she feared sought to take her into custody. In her testimony, she thus effectively conceded that the M-4 rifle could have been used by somebody else although her counsel had proffered expert evidence that this was unlikely. At issue was the admissibility of certain anti-American documents in her possession. The Second Circuit observed that "a defense theory that the defendant did not commit the charged act effectively removes issues of intent and knowledge from the case[,]" *id.* at 702, however, it held that the documents in question were nonetheless properly admitted to provide "an explanation of *why* the defendant would engage in the charged conduct" which "becomes highly relevant when the defendant argues that he did not commit the crime." *Id.* As the Second Circuit observed: "This motive was relevant to *the* ultimate issue in dispute at trial—whether Siddiqui picked up and fired the M-4 rifle at the American interview team." *Id.* at 703.

In *United States v. Sampson*, 385 F.3d 183 (2d Cir. 2004), the Second Circuit held when a defendant challenges only identity, it is error to admit prior instances of drug dealing and to allow the government to argue that identity was established because defendant "was a drug dealer." *Id.* at 192. The court noted that a defendant may foreclose the admission of such evidence "by stipulating to intent and challenging only identity[.]" *Id.* at 193. In such circumstances, "intent is not placed in issue by a defense that the defendant did not do the charged act at all" and that when "a defendant unequivocally relies on such a defense, evidence of other acts is not admissible for the purpose of proving intent." *Id.* (citations omitted).

In the instant case, far from stipulating that the SEC can prove that, in 2010-2012, he possessed the knowledge and opportunity to access KGM's material nonpublic information had he chosen to do so, Mr. McGinnis has placed those issues directly at issue by claiming that he "did not have access to KGM's sensitive financial information as part of his work at KGM[,]" "did not know the location of KGM's earnings information[,]" and "did not know that [Batchops] provided access to KGM's Finance/Private folder." (Doc. 211-1 at 2, ¶¶ 3, 4, 10.) Mr. McGinnis also argues that he

did not have sole possession of the KGM computer at issue and that it could have been accessed by other KGM employees in a number of ways. In this respect, he puts the *identity* of the person or persons who accessed KGM's material nonpublic information at issue as well.

The 2013 forensic evidence purports to show that Mr. McGinnis had the requisite knowledge, opportunity to access, and intent to access KGM's material nonpublic information in 2013 and that he used his KGM computer to do so. In turn, the SEC contends this evidence supports a reasonable inference that Mr. McGinnis possessed the same knowledge, opportunity to access, and intent in the preceding years and that it was Mr. McGinnis, and not some other KGM employee, who did so. Courts permit the use of other acts evidence for this purpose. *See, e.g., United States v. Hadaway*, 681 F.2d 214, 217 (4th Cir. 1982) (rejecting challenges to "the relevance of the conduct because it occurred approximately eighteen months after the crime charged" and noting that "subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one's thought patterns had already been so developed and were so operating on another previous occasion"). The SEC has therefore offered the 2013 forensic evidence for a proper purpose "because it [purportedly] demonstrates that [Mr. McGinnis] knew how to illegally take advantage of his position . . . for personal gain[,]" *SEC v. DiBella*, 587 F.3d 553, 571 (2d Cir. 2009),[11] and pertains to facts Mr. McGinnis has placed at issue.

Having concluded that the SEC proffers the 2013 forensic evidence for a proper purpose, the court must next determine whether the other acts evidence satisfies "the relevancy requirement of Rule 402—as enforced through Rule 104(b)." *Huddleston*, 485

[11] *See United States v. Rutkoske*, 506 F.3d 170, 177 (2d Cir. 2007) (concluding that the government's evidence of defendant's subsequent fraudulent activities "was introduced for the permissible purpose of proving his knowledge"); *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (recognizing "Fed. R. Evid. 404(b) allows the admission of evidence of 'other crimes, wrongs, or acts' in order to prove, *inter alia*, that the defendant had knowledge of a pertinent fact."); *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (noting Rule 404(b) evidence "may be admitted . . . to show that a defendant who claims that his conduct had an innocent explanation had the knowledge or intent necessary to commit the charged offense.").

U.S. at 691. Mr. McGinnis argues the 2013 forensic evidence is not relevant to his alleged conduct in 2010-2012 because each of the thirteen acts of trading is distinct and must be analyzed independently. The SEC counters that the 2013 forensic evidence is relevant not only to knowledge, opportunity, intent, modus operandi, and identity, but to establish Mr. McGinnis's course of conduct.

Evidence is relevant under Fed. R. Evid. 401 if it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Abu-Jihaad*, 630 F.3d 102, 132 (2d Cir. 2010). Courts require that "[t]o be relevant, the other act must be sufficiently similar to the conduct at issue to permit the jury reasonably to draw an inference from the act that the state of mind of the actor is as the proponent of the evidence asserts." *United States v. Mostafa*, 16 F. Supp. 3d 236, 252 (S.D.N.Y. 2014). Relevant evidence is admissible unless another rule or law provides otherwise. Fed. R. Evid. 402. "Rule[] [401's] basic standard of relevance thus is a liberal one." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587 (1993).

The relevance of the 2013 forensic evidence to the SEC's claims throughout the time period is clear. The 2013 forensic evidence purports to show how and when Mr. McGinnis accessed KGM's material nonpublic information in advance of KGM public earnings announcements. For example, on May 7, 2013, the day before a KGM earnings announcement, the 2013 forensic evidence purportedly shows that the Batchops login was used on Mr. McGinnis's KGM computer to access both his personal Facebook page (thus supporting a reasonable inference that he was in possession of his KGM computer at the time), as well as the draft earnings announcement in KGM's Finance/Private folder. (Regard Report, Doc. 240-9 at 25-27, 37-42.) Because the SEC contends that Mr. McGinnis used a similar modus operandi during the 2010-2012 time period, the "chain of inferences necessary to connect the other act evidence with the charged crime" is not "unduly long," *Mostafa*, 16 F. Supp. 3d at 252 (internal quotation marks omitted), and "permit[s] the jury reasonably to draw from that act the . . . inference advocated by the proponent of the evidence." *United States v. Curley*, 639 F.3d 50, 57 (2d Cir. 2011). The

2013 forensic evidence thus "tend[s] to prove the [SEC]'s case" and "adds context and dimension" to the issue of whether Mr. McGinnis acted with similar knowledge and intent, and used the same modus operandi, to access the Finance/Private folder prior to 2013. *Gonzalez*, 110 F.3d at 941. The 2013 forensic evidence is therefore relevant under Fed. R. Evid. 401.

Evidence that is admissible under Rule 404(b) and Rule 401 must also satisfy the requirements of Rule 403. *Huddleston*, 485 U.S. at 691. Mr. McGinnis argues that the 2013 forensic evidence is unfairly prejudicial because "[i]t is highly likely that a fact-finder would draw the impermissible propensity inference . . . [that] because Mr. McGinnis purportedly accessed [material nonpublic information] in 2013, he must have done so in 2010-12 as well." (Doc. 271 at 36.) The SEC responds that the 2013 forensic evidence has a high probative value and is not *unfairly* prejudicial merely because it supports a conclusion that Mr. McGinnis engaged in insider trading throughout the charged period.

Rule 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "In weighing the probative value of evidence against the dangers and considerations enumerated in Rule 403, the general rule is that the balance should be struck in favor of admission." *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980); *Hines v. Consol. Rail Corp.*, 926 F.2d 262, 274 (3d Cir. 1991) (warning that "excluding evidence under Fed. R. Evid. 403 at the pretrial stage is an extreme measure").

"[W]hat counts as the Rule 403 'probative value' of an item of evidence . . . may be calculated by comparing evidentiary alternatives." *Old Chief v. United States*, 519 U.S. 172, 184 (1997). "Probity in this context is not an absolute; its value must be determined with regard to the extent to which the [fact] is established by other evidence, stipulation, or inference." *United States v. Beechum*, 582 F.2d 898, 914 (5th Cir. 1978), *cert. denied*, 440 U.S. 920 (1979). In addition, "the probative value of the proffered

evidence depends largely on whether or not there is a close parallel between the [acts] charged and the acts shown." *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) (internal quotation marks omitted).

For purposes of the pending motions, the probative value of the 2013 forensic evidence is high as it gives rise to a reasonable inference that Mr. McGinnis engaged in parallel acts of insider trading throughout the charged period and thus was engaged in an unbroken course of illegal conduct. *See Curley*, 639 F.3d at 59, 62 (recognizing the admissibility of Rule 404(b) evidence under Rule 403 where defendant's prior acts "paralleled the charged conduct" and "demonstrate[d] a pattern of activity that continued up to the time of the charged conduct."); *United States v. Downing*, 297 F.3d 52, 59 (2d Cir. 2002) (affirming trial court decision to admit evidence that defendant had previously prepared false audit reports under Rule 403 because defendant denied knowledge or intent to commit securities or wire fraud and as a result "made evidence of his previous participation in a substantially similar scheme highly probative.").

Moreover, any prejudice Mr. McGinnis suffers as a result of the admission of the 2013 forensic evidence is not "unfair."[12] The Supreme Court has observed that "[t]he term 'unfair prejudice' . . . speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief*, 519 U.S. at 180. Evidence is thus unfairly prejudicial when it "tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Massino*, 546 F.3d 123, 132 (2d Cir. 2008) (internal quotation marks omitted). Other acts evidence creates

---

[12] Mr. McGinnis chose to move for partial summary judgment and opted to confine his motion to the years 2010-2012 which arguably artificially circumscribed the evidence the court would ordinarily consider in deciding an insider trading claim for an otherwise continuous time period. At trial, Mr. McGinnis does not claim he would be entitled to a bifurcation of the evidence in this manner. Moreover, the reason for excluding evidence that is unfairly prejudicial (because it may inflame the jury) is simply not present at the summary judgment phase. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 428 (7th Cir. 2000) (observing that "while it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, normally the balancing process contemplated by the rule is best undertaken at the trial itself.") (internal citation omitted).

24

an unfairly prejudicial effect where it proves a fact not in issue or "excite[s] emotions against the defendant." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980).

The 2013 forensic evidence in this case is no more "sensational [and] disturbing" than the charged 2010-2012 events. *See Curley*, 639 F.3d at 59; *see also Mostafa*, 16 F. Supp. 3d at 256 (concluding under Rule 403 that defendant's statements about bin Laden and al Qaeda were "no more disturbing than the crimes charged" where government alleged he had committed crimes relating directly to supporting those groups). It is relatively dry, technical information that will be undoubtedly challenged either by equally dry, technical competing expert evidence or on cross-examination. Accordingly, while it may be incriminatory, it is certainly not inflammatory. There is thus no *unfair* prejudice in the admission of the 2013 forensic evidence. *Becker v. ARCO Chem. Co.*, 207 F.3d 176 (3d Cir. 2000), on which Mr. McGinnis most heavily relies, does not hold otherwise.

In *Becker*, the plaintiff-employee brought suit against his employer for age discrimination. The trial court permitted the employee to introduce evidence that a manager, who was not the decision-maker in his case, had previously asked the employee to fabricate deficient performance by a fellow employee. Noting that the evidence had little probative value as it involved "a different situation with a different employee," the trial court initially excluded the evidence because it concluded that any probative value was substantially outweighed by the danger of unfair prejudice and juror confusion. *Id.* at 186. In the course of the trial, however, the trial court admitted the evidence under Rule 404(b) as evidence of motive, intent, preparation, plan, or knowledge and subsequently characterized it as evidence of a "scheme or plan of fabricating reasons used by the decisionmaker in terminating employees." *Id.* at 189.

On appeal, the Third Circuit held that the use of the challenged evidence at trial created an impermissible inference that the employer "acted in conformity with its prior conduct" towards a different employee. *Id.* at 191. The Third Circuit noted that "this sort of character-based inference 'is the very evil that Rule 404(b) seeks to prevent.'" *Id.* at 194 (citation omitted).

The present case is clearly distinguishable. The SEC does not seek to introduce evidence that, on other occasions, Mr. McGinnis allegedly unlawfully took other property from KGM and thus has propensity to engage in theft. Rather, the SEC cites the 2013 forensic evidence as evidence of how Mr. McGinnis accessed and misappropriated the same categories of KGM's material nonpublic information throughout the charged time period. The 2013 forensic evidence is thus not propensity evidence.

Because the 2013 forensic evidence is offered for a proper purpose, relevant, and satisfies the balancing test set forth in Fed. R. Evid. 403, it is admissible under Rule 404(b) for the purposes of the pending motions for summary judgment.

## E.    Whether Disputed Facts Preclude Summary Judgment in Mr. McGinnis's Favor.

Mr. McGinnis asserts that he is entitled to judgment as a matter of law in his favor for the 2010-2012 time period, notwithstanding the presence of disputed facts, because: (1) the SEC lacks evidence that he had access to and possessed KGM's material nonpublic information during the 2010-2012 time frame; (2) the SEC cannot identify the device he allegedly used to access KGM's material nonpublic information during the 2010-2012 time period; and (3) the SEC cannot identify the specific material nonpublic information he allegedly possessed at the time of the trades in question. The SEC counters that even in the absence of the 2013 forensic evidence, it has proffered sufficient facts to preclude summary judgment on each of these issues.

The parties appear to agree that there is no requirement that the SEC proffer direct evidence of Mr. McGinnis's possession in order to survive summary judgment. *See Roszak*, 495 F. Supp. 2d at 887 ("[D]irect evidence is rarely available in insider trading cases, since usually the only witnesses to the exchange are the insider and the alleged tippee, neither of whom [is] likely to admit liability."). Circumstantial evidence may thus, alone, be sufficient.[13] As the First Circuit explained:

---

[13] The Second Circuit has upheld jury findings of possession of material nonpublic information based entirely on circumstantial evidence. *See Warde*, 151 F.3d at 46-47 (rejecting argument that jury verdict reflected "guilt by association" and "thin pieces of circumstantial evidence" and concluding that there was "ample evidence" of possession even if the evidence was

The defendant argues that proof of "opportunity" or "access" to material, nonpublic information is not the same as proving actual possession. That is correct, but does not carry the day. While the defendant is correct that opportunity alone does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequences of events, culminating with successful stock trades, creates a compelling inference of possession by the tipper. *See, e.g., SEC v. Warde*, 151 F.3d 42, 46-49 (2d Cir. 1998); *SEC v. Singer*, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992); *SEC v. Musella*, 578 F. Supp. 425, 440-41 (S.D.N.Y. 1984).

*United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001).

"[C]ompelling evidence" of possession may be found by examining "myriad factors, including (1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and tippee." *Id.* at 21-22. Correspondingly, courts have recognized that "attendant circumstances" may be sufficient to make "it reasonably clear that there was an actual tip consisting of material nonpublic information." *SEC v. One or More Unknown Traders in Sec. of Onyx Pharms., Inc.*, 296 F.R.D. 241, 253 (S.D.N.Y. 2013) (ruling on asset freeze and motion to dismiss).

In this case, the "attendant circumstances" consist of evidence that purports to show how and when Mr. McGinnis used his position to access KGM's Finance/Private folder and Sales Portal rendering this case distinguishable from those in which the alleged access is no greater than that of all other company employees. *See, e.g., SEC v. Garcia*, 2011 WL 6812680, at *4, *13-15 (N.D. Ill. Dec. 28, 2011) (granting summary judgment because "the SEC has not shown that Sanchez ever had an opportunity to acquire nonpublic information . . . the SEC theorizes that Sanchez was informed of some unidentified information related to the proposed acquisition, at an unidentified time, by an unidentified insider, and traded on this unidentified information" and noting that "this

---

circumstantial); *see also Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960) (explaining that "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.").

chain of speculation does not raise a material issue of fact for consideration by a jury.") (citations omitted).

As additional circumstantial evidence, the SEC points out that, throughout the time period alleged, Mr. McGinnis and Mr. Pugach were in frequent contact especially before KGM's earnings announcements, engaged in similar KGM trading activities and achieved similar results, and that during the 2010-2013 time frame, Mr. McGinnis profited over $2,000,000 with a 8,717% rate of return from his KGM earnings announcement trading, despite the fact that the market did not perform as well during that same time period. The SEC cites its expert witness's opinion that Mr. McGinnis's trading successes and those of his co-Defendants "wildly exceed[ed] full time investment professionals[,]" cannot be explained by Defendants' claim that they closely followed KGM's stock, and are thus "highly unusual." (Doc. 240 at 5, Disputed Fact 20; Doc. 240-11, Mayer Report at 87.) "Courts in the [Second Circuit] have held that circumstantial evidence such as suspicious timing of trades, contacts between potential tippers and tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred." *Singer*, 786 F. Supp. at 1164-65; *see also SEC v. Ginsburg*, 362 F.3d 1292, 1299 (11th Cir. 2004) ("The larger and more profitable the trades . . . the stronger the inference that the trader was acting on the basis of inside information").

When examined in the light most favorable to the SEC, the disputed facts regarding Mr. McGinnis's knowledge and opportunity to access KGM's material nonpublic information during the 2010-2012 time period, his inexplicably successful KGM trading, and his numerous communications with Mr. Pugach around KGM's earnings announcements followed by similar trading activity by the two men, give rise to a reasonable inference of insider trading sufficient to withstand summary judgment. *See Ginsburg*, 362 F.3d at 1301 (concluding summary judgment was inappropriate where defendant engaged in suspicious pattern of trading after receiving calls from company insider); *Singer*, 786 F. Supp. at 1164 (concluding SEC presented sufficient circumstantial evidence to survive summary judgment and noting that "it is clear that

28

'[p]roof of insider trading can well be made through an inference from circumstantial evidence and not solely upon a direct testimonial confession.'").

Because there remain disputed issues of fact as to whether Mr. McGinnis accessed and traded on KGM's material nonpublic information during the 2010-2012 time period, Mr. McGinnis's partial motion for summary judgment with regard to that time period is DENIED. (Doc. 211.) As a result, Mr. Pugach's and Mr. Suchowiejko's conditional motion for summary judgment must also be DENIED. (Doc. 224.)

### F.     Whether the SEC can Establish that Mr. McGinnis Received a "Personal Benefit" from Mr. Pugach.

In a separate motion for partial summary judgment, Mr. McGinnis argues that under *Newman*, he cannot be held liable for Mr. Pugach's KGM trading profits because the SEC cannot establish that, in exchange for the alleged provision of KGM's material nonpublic information to Mr. Pugach, Mr. McGinnis received a benefit that is "objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.[14]  The SEC opposes the motion, arguing that it has satisfied its burden under controlling Supreme Court precedent governing civil insider trading cases or, in the alternative, asserting that whether Mr. McGinnis received a sufficient personal benefit in return for insider information is a disputed question of fact that prohibits summary judgment in his favor.

As a threshold issue, the court notes that *Newman* did not "overrule" the Supreme Court's decision in *Dirks v. SEC*, 463 U.S. 646 (1983).[15]  *Newman* is a criminal case requiring proof beyond a reasonable doubt. There, the Second Circuit found the evidence of a personal benefit insufficient where the tippees were remote and "many levels removed from corporate insiders[,]" *Newman*, 773 F.3d at 448, "the defendants 'knew

---

[14] In this motion, Mr. McGinnis is not challenging his primary liability for his personal KGM trading profits. (Doc. 228-1 at 5 n.1.) Mr. McGinnis, however, extends his request for judgment as a matter of law in his favor to Mr. Suchowiejko's trading profits as well.

[15] Mr. McGinnis asserts that "the SEC claims that *Newman* leaves unchanged the holding of *Dirks* that 'evidence of friendship alone is sufficient to send the personal benefit issue to the jury' . . . In no uncertain terms, *Newman* specifically clarifies the limits of *Dirks*[.]" (Doc. 259 at 4-5.)

next to nothing' about the tippers, were unaware of the circumstances of how the information was obtained, and 'did not know what the relationship between the [tipper] and the first-level tippee was[.]'" *SEC v. Payton*, 2015 WL 1538454, at *6 (S.D.N.Y. Apr. 6, 2015) (quoting *Newman*, 773 F.3d at 453-54). *Newman* thus made clear that the "personal benefit" required as part of the *quid pro quo* for insider trading cannot consist of "the mere fact of a friendship, particularly of a casual or social nature[,]" without additional "proof of a meaningfully close personal relationship" and an exchange that presents "at least a potential gain of a pecuniary or similarly valuable nature." *Newman*, 773 F.3d at 452.

Although the *Newman* court opined that the benefit to the tipper does not necessarily need to be "*immediately* pecuniary," it nevertheless stated that it "must be of some consequence." *Id.* Under Second Circuit precedent, the term "personal benefit" is "broadly defined to include not only pecuniary gain, but also, *inter alia*, any reputational benefit that will translate into future earnings and the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend." *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013) (internal citations, alterations, and quotation marks deleted). The SEC therefore "need not show that the tipper expected or received a specific or tangible benefit in exchange for the tip." *Warde*, 151 F.3d at 48. A personal benefit may exist when an insider passes material nonpublic information to a trading relative or friend because "[t]he tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient." *Dirks*, 463 U.S. at 664.

In this case, the SEC proffers evidence of a close, longstanding friendship between Mr. McGinnis and Mr. Pugach, which included attending the same school, working at the same employer for a period of time, Mr. Pugach's serving as a groomsman at Mr. McGinnis's wedding, a friendship between their respective wives, the exchange of gifts, and Mr. Pugach's assistance in tasks at Mr. McGinnis's home. Although Mr. McGinnis is perhaps correct that the gifts at issue are of such nominal value and are so closely tied to customary gift-giving occasions that no rational juror could find they represent a *quid pro quo* for insider information, the gifts nonetheless remain relevant to explain the

30

degree to which Mr. McGinnis and Mr. Pugach jointly celebrated the most important events in their lives and were therefore far from casual friends or remote business acquaintances who encountered each other infrequently. *See Obus*, 693 F.3d at 291 (ruling that "the undisputed fact that [the insider] and [the recipient] were friends from college is sufficient to send to the jury the question of whether [the insider] received a benefit from tipping [the recipient]. This same evidence creates a question of fact with respect to whether [the insider] intentionally tipped [the recipient]. And it is sufficient for a jury to conclude that [the insider] intentionally or recklessly revealed material non-public information to [the recipient], knowing that he was making a gift of information [the recipient] was likely to use for securities trading purposes.") (internal citations omitted).

In addition to the close personal relationship between Mr. McGinnis and Mr. Pugach, the SEC has proffered evidence of a close business relationship between the two men. This relationship included the exchange of information regarding KGM stock and their joint viewing of KGM's public earnings statements starting in 2012 in Mr. McGinnis's home. This practice required Mr. Pugach to travel to another state so that he and Mr. McGinnis could be together when KGM's earnings announcements were made. The SEC contends that in exchange for Mr. McGinnis's KGM insider information, Mr. Pugach would lend his superior expertise to Mr. McGinnis regarding how best to exploit the KGM insider information in trading activity. It is undisputed that both men were highly successful with certain KGM trades.

The SEC has also proffered evidence that the business relationship between the two men extended beyond KGM stock and included Mr. Pugach's provision of trading advice to Mr. McGinnis regarding other securities and commodities and suggestions of business opportunities that they could jointly undertake and from which they could both profit. Mr. McGinnis concedes that "as [their] Facebook messages . . . show, the sharing of information went both ways: Mr. McGinnis provided his thoughts to Mr. Pugach, and Mr. Pugach provided his thoughts to Mr. McGinnis." (Doc. 259 at 7.) The alleged KGM tips thus cemented the personal and business relationship between Mr. McGinnis, the

alleged insider, and Mr. Pugach, the alleged tippee. *See United States v. Riley*, 2015 WL 891675, at \*5 (S.D.N.Y. Mar. 3, 2015) ("If a tip maintains or furthers a friendship, and is not simply incidental to the friendship, that is circumstantial evidence that the friendship is a *quid pro quo* relationship.").

In *Dirks*, the Supreme Court held that "[d]etermining whether an insider personally benefits from a particular disclosure[] [is] a question of fact[.]" *Dirks*, 463 U.S. at 664; *see also Obus*, 693 F.3d at 291 (determining a jury must resolve "the question of whether [the tipper] received a benefit from tipping [the tippee]."). Summary judgment is appropriate only when "no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, [that] there is no genuine issue of material fact[.]" *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

When the evidence in the instant case is examined in the light most favorable to the SEC, a rational jury could find that Mr. McGinnis received a "personal benefit" as a *quid pro quo* for the alleged exchange of KGM's material nonpublic information to Mr. Pugach. A rational jury could further conclude that Mr. McGinnis intended to benefit Mr. Pugach. "The showing needed to prove an intent to benefit is not extensive." *SEC v. Yun*, 327 F.3d 1263, 1280 (11th Cir. 2003). It is therefore generally a jury question whether the evidence of an intent to benefit is sufficient. *See id.* at 1280 (holding that evidence that defendants were "friendly" and "worked together for several years" was sufficient for jury to reasonably find an intent to benefit); *see also SEC v. Sargent*, 229 F.3d 68, 77 (1st Cir. 2000) (finding evidence of intent to benefit where the tipper passed on information "to effect a reconciliation with his friend and to maintain a useful networking contact").

Because there are disputed issues of material fact that prevent the court from determining whether, as a matter of law, Mr. McGinnis should be held liable for Mr. Pugach's and Mr. Suchowiejko's KGM trading profits, Mr. McGinnis's second partial motion for summary judgment KGM trading profits must be DENIED. (Doc. 228.)

### G.   Whether Mr. Suchowiejko is Entitled to Summary Judgment.

Mr. Suchowiejko seeks summary judgment in his favor, arguing that the SEC cannot establish that he knew or should have known that Mr. Pugach received insider information in exchange for a personal benefit conferred on an insider or that KGM's material nonpublic information was obtained and conveyed to him illegally. The SEC opposes the motion, arguing that there are disputed issues of material fact and that Mr. Suchowiejko's knowledge and intent are questions for the jury.

"The insider trading case law is not confined to insiders or misappropriators who trade for their own account. Section 10(b) and Rule 10b-5 also reach situations where the insider or misappropriator tips another who trades on the information." *Obus*, 693 F.3d at 285. The tippee must "have some level of knowledge that by trading on the information the tippee is a participant in the tipper's breach of fiduciary duty." *Id.* at 287; *see also Dirks*, 463 U.S. at 660 (holding tippee has duty to abstain and disclose "only when the insider has breached his fiduciary duty . . . and the tippee knows or should know that there has been a breach").

Courts consider a number of factors when determining whether the tippee "knew or should have known" that the tipper breached a fiduciary duty when passing information, including whether the tippee (1) was a sophisticated financial analyst; (2) knew the tipper worked at the company to which the information related; (3) knew the tipper had access to insider information; and (4) knew the information being passed was material nonpublic information. *Obus*, 693 F.3d at 292.

Drawing all reasonable inferences in the SEC's favor, a rational jury could conclude that Mr. Suchowiejko, who had an MBA from the University of Chicago, was a Management Information Manager, and traded securities since 2000 or 2001, was a sophisticated trader based on his education, employment, and experience.

A rational jury could further find that Mr. Suchowiejko knew that the tipper worked at KGM, even if he did not know the alleged tipper was Mr. McGinnis. In mid-2010, Mr. Suchowiejko and Mr. Pugach, who are related through marriage, reestablished their acquaintance by socializing in person and corresponding via email about

investments and video games. Mr. Suchowiejko knew that Mr. Pugach was a successful KGM trader, and had at least two contacts at KGM, of whom he could ask a personal favor. On this basis, Mr. Suchowiejko asked Mr. Pugach to "pass a resume of a friend up the food chain in GMCR[,]" (Doc. 262 at 2, ¶ 3), and Mr. Pugach did so. Although there is no direct evidence that Mr. Suchowiejko knew Mr. McGinnis or his role at KGM, in light of the close, longstanding relationships between Mr. McGinnis and Mr. Pugach and Mr. Pugach and Mr. Suchowiejko, and their mutual interest in trading KGM stock, a jury could find incredible Mr. Suchowiejko's claim that Mr. Pugach had never even mentioned the name of "his very good friend" Mr. McGinnis who worked at KGM. *See Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge"). In turn, a jury could conclude that the need to conceal this relationship was indicia of guilt and an intent to deceive. *See, e.g., United States v. Bank of New York Mellon*, 941 F. Supp. 2d 438, 469 (S.D.N.Y. 2013) (noting the government's "allegations about the [defendant's] alleged efforts to conceal its pricing practices also provide some . . . support for the inference of intent to deceive") (internal quotation marks and alterations omitted).

A rational jury could also conclude that Mr. Suchowiejko knew or should have known that Mr. Pugach's KGM tips constituted the passing of insider information. In the fall of 2010, Mr. Pugach recommended KGM as a good investment prospect to Mr. Suchowiejko. Thereafter, prior to KGM earnings announcements in December of 2010, July of 2011, and February of 2012, Mr. Pugach invited Mr. Suchowiejko to his home purportedly to discuss video games in person. After their in-person meetings, both men engaged in similar KGM trades with similar results. Mr. Suchowiejko's explanation "as to why his options purchases might be similar to those purchased by Mr. Pugach[,]" (Doc. 262 at 1, ¶ 2), disputes the inference created by the facts, but does not disprove the similarities between their trading activity. In this case, reasonable minds could therefore differ as to the import of the evidence before the court. *See Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993) ("There is no material fact

34

issue only when reasonable minds cannot differ as to the import of the evidence before the court.").

Although Mr. Suchowiejko concedes that his KGM trades were "risky," (Doc. 222-3 at 9), and represented "a substantial part" of his net worth, probably around 20-30%, he cites his own testimony that he was not risk adverse and was willing to take "[d]efinitely more" risks in his pension account, *id.*, as evidence that this fact does not render his KGM trading suspicious. Again, a jury must weigh whether Mr. Suchowiejko's willingness to take substantial risks when trading on KGM stock was indicia of special knowledge.

In addition to "luck, research, and analysis," Mr. Suchowiejko "used the recommendations of Mr. Pugach at times, and we've discussed that, so to the extent that he's done research and that's helped me." (Doc. 262-1 at 15.) However, Mr. Suchowiejko did not follow Mr. Pugach's research and advice with regard to stocks other than KGM. He thus apparently credited Mr. Pugach with more reliable knowledge when his tips pertained to KGM. Mr. Suchowiejko was highly successful in his trades of KGM around earnings announcements, but was otherwise unsuccessful in his trading. Based on these facts, a rational jury could conclude that Mr. Suchowiejko was willing to rely heavily on Mr. Pugach's KGM tips and engage in risky trades based thereon because he understood Mr. Pugach's tips came from an inside source with confidential information that created a trading advantage and made significant profits more readily attainable. Contrary to Mr. Suchowiejko's contention, there is no requirement that he understand the precise *quid pro quo* exchanged for insider information as "[a]n allegation that the tippee knew of the tipper's breach necessarily charges that the tippee knew that the tipper was acting for personal gain." *Newman*, 773 F.3d at 449 n.4.

Finally, the SEC contends that some of the Facebook messages between the two men were not references to video games but were coded references to KGM stock. Mr. Suchowiejko disputes this characterization and denies "that any of the emails were in any way suspicious," (Doc. 262 at 4, ¶5), but acknowledges that he understood that Mr. Pugach's question "You back in?" to be an inquiry to Mr. Suchowiejko regarding

whether he was back to buying KGM stock. (Doc. 245-1 at 12.) Courts have recognized that the use of coded language may be evidence of an attempt to conceal illegal activity. *See United States v. Gotti*, 459 F.3d 296, 337 (2d Cir. 2006) (observing that "the defendants would communicate about the transactions in coded language" as evidence of an attempt to conceal money laundering); *United States v. Cedeno-Perez*, 579 F.3d 54, 59 (1st Cir. 2009) (observing that a rational jury "could have reasoned that [defendant's] use of code words and his concern about police detection reflected an awareness that the currency he was transferring derived from unlawful activity"); *United States v. Prince*, 214 F.3d 740, 752 (6th Cir. 2000) (finding the concealment prong of statute in question was satisfied by an "elaborate arrangement" which "protected [d]efendants from a potential paper trail").

When the evidence is viewed in the light most favorable to the SEC, the number, timing, and manner of communications between Mr. Pugach and Mr. Suchowiejko; the alleged use of coded communications and the need for in-person communications to avoid a paper trail; their similar trading activity and similar highly successful results around KGM earnings announcements; Mr. Suchowiejko's reliance on Mr. Pugach's KGM trading advice notwithstanding Mr. Suchowiejko's own status as a sophisticated trader; and the very close relationships between Mr. McGinnis and Mr. Pugach and Mr. Pugach and Mr. Suchowiejko are sufficient to render it a question for the jury whether Mr. Suchowiejko, in his status as an alleged tippee, knew or should have known about alleged tipper Mr. McGinnis's fiduciary breach. *See Obus*, 693 F.3d at 288 (noting that question of knowledge and intent "is a fact-specific inquiry turning on the tippee's own knowledge and sophistication and on whether the tipper's conduct raised red flags that confidential information was being transmitted improperly.").

As for Mr. Suchowiejko's argument that the SEC has failed to present evidence that he acted with an intent to deceive, the SEC has proffered sufficient circumstantial evidence, as described herein, to render the question of whether he possessed the requisite scienter a question for the jury. *See In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1256 (S.D.N.Y. 1996) ("It is typically inappropriate to decide issues of intent and

motive on summary judgment, unless the nonmovant has failed to adduce any evidence from which a reasonable jury could infer that the defendants acted with scienter"); *see also Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751 (2d Cir. 1992) (denying motion for summary judgment where defendants' "thought processes" were at issue); *Wechsler v. Steinberg*, 733 F.2d 1054, 1058 (2d Cir. 1984) ("Issues of motive and intent are usually inappropriate for disposition on summary judgment.").

Pursuant to Fed. R. Civ. P. 56(c), because there are disputed issues of material fact regarding whether Mr. Suchowiejko knew or should have known that Mr. Pugach received insider information in exchange for a personal benefit conferred on Mr. McGinnis, Mr. Suchowiejko's motion for partial summary judgment (Doc. 222) must be DENIED.

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Mr. McGinnis's motion for partial summary judgment, (Doc. 211), and DENIES Mr. McGinnis's second motion for partial summary judgment, (Doc. 228); DENIES Mr. Pugach and Mr. Suchowiejko's joint conditional motion for partial summary judgment, (Doc. 224); and DENIES Mr. Suchowiejko's motion for summary judgment. (Doc. 222.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 23rd day of September, 2015.

Christina Reiss, Chief Judge
United States District Court