U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 FEB -1  PM 4:26

CLERK

BY_____
   DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SECURITIES & EXCHANGE          )
COMMISSION,                    )
                               )
        Plaintiff,             )
                               )
    v.                         )        Case No. 5:14-cv-6
                               )
CHAD C. McGINNIS,              )
SERGEY PUGACH, and             )
JANUSZ SUCHOWIEJKO,            )
                               )
        Defendants, and        )
                               )
BELLA PUGACH,                  )
                               )
        Relief Defendant.      )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTIONS TO EXCLUDE AND STRIKE THE OPINIONS OF
PLAINTIFF'S EXPERT WITNESS DANIEL L. REGARD II**
(Docs. 454, 458, & 461)

Pending before the court are the motions of Defendants Chad C. McGinnis and

Sergey Pugach (collectively, "Defendants") to exclude the opinions of Plaintiff Securities

and Exchange Commission's (the "SEC") expert witness Daniel L. Regard II (Docs. 458

& 461) and to strike his May 30, 2018 rebuttal opinion (the "Rebuttal Opinions") (Doc.

454).  The SEC opposes the motions.

On November 20, 2018, the court held an evidentiary hearing pursuant to *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny at which Mr.

Regard testified.  Upon the conclusion of the hearing, the court took the pending motions

under advisement.

The SEC is represented by Dugan Bliss, Esq., Gregory A. Kasper, Esq., James A.

Scoggins, Esq., and Polly A. Atkinson, Esq.  Mr. McGinnis is represented by Evan I.

Cohen, Esq., Kevin M. Henry, Esq., Michael Q. English, Esq., and Benjamin M. Arrow, Esq.

## I.      Factual and Procedural Background.

The SEC asserts a claim that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("the Act") and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b), based on an alleged insider trading scheme involving the publicly traded stock of Keurig/Green Mountain Coffee Roasters ("KGM"). Between 2010 and 2013, the SEC alleges that Defendants traded in response to thirteen earnings announcements made by KGM.

Defendant McGinnis was employed at KGM from December of 2006 until his termination in July of 2013. During his tenure at KGM, Mr. McGinnis worked as part of KGM's Information Systems and Technology Group and was a Systems Architect Development Manager at the time of his termination. The SEC alleges that Defendant McGinnis accessed KGM's hardware and software systems in order to acquire Material Non-Public Information ("MNPI") which he allegedly used to illegally trade in KGM stock.

The SEC's expert witness, Daniel L. Regard II, is the CEO, Managing Director, and owner of Intelligent Discovery Solutions, Inc. ("IDS"), a firm that provides expert witness and consulting services regarding electronic technology to legal and business communities. IDS employs approximately forty-five people and has three divisions: discovery services (primarily focused on the management and storage of electronic discovery); digital forensics (focused on the extraction and interpretation of digital artifacts); and structure data analytics (focused on large corporate enterprise databases and applications and the interpretation of data from those systems).

Mr. Regard has a Bachelor's Degree in Computer Science from the University of Southwestern Louisiana and a Masters of Business Administration and a Juris Doctorate from Tulane University. He also has a certificate in European legal practice. He has co-authored a book chapter and papers on electronic discovery, provided trainings and conference presentations, and worked on hundreds of cases involving digital forensics. He has testified in deposition and offered reports and declarations as an expert witness on

the issue of computer forensics in numerous civil and criminal cases.  He describes the primary basis of his computer knowledge as the result of "hands-on[]" experience commencing in 2000-2001.  (Doc. 474-2 at 3.)

At the SEC's request, Mr. Regard analyzed four KGM computers which were allegedly assigned to or associated with Defendant McGinnis: (1) a HP Compaq dc7700 desktop workstation ("GMCR36152"); (2) a HP Compaq 8200 Elite Workstation ("CHADMTDC"); (3) an Apple MacBook Pro ("KGMs-MacBook-Pro"); and (4) an HP EliteBook 2560p ("CHADMCLT").  Mr. Regard also reviewed deposition testimony, certain filings, the KGM Keycard Access Logs for KGM's building, and KGM Sales Portal Access Logs of Defendant McGinnis.  Mr. Regard authored five expert witness reports between November 2014 and June 2018 pertaining to digital forensics which he defines as the extraction and analysis of information from computers, smartphones, emerging devices, cloud computing, and enterprise applications.  He defines the term "digital artifact" to denote any type of electronic data recovered from a device including files, metadata, log entries, and partial and complete records.

In rendering his opinions in this case, Mr. Regard's methodology was to obtain a copy of the hard drive of the computer he was examining, use forensic software tools to extract and express the digital artifacts, and render his opinions based thereon.  In the course of rendering his opinions in this case, his team used EnCase, X-Ways, TZWorks, and ShellBag Explorer as forensic software tools.  He relied on his team to choose the forensic tools that would be used, to extract and express the data, and to provide assistance in data interpretation.[1]  Although in his December 16, 2015 deposition he

---

[1]    Q. So I take it since [your team] told you only after they had made the selection of EnCase and X-Ways, that you didn't provide any input on any other programs that could be used in this matter.

A. No, I didn't, and that would be fairly standard for me.  I rely on my team to identify the tools that they are familiar with.  I look at the end results and ask them to validate them, which they did, and I opine on those results.

(Doc. 474-2 at 14.)

could not describe the differences between the forensic software tools used in this case,[2] he concedes those tools were "crucial" to his analysis.  (Doc. 501 at 34.)

In conducting a forensic examination, Mr. Regard opined that it is common to examine space that has been allocated and controlled by the computer's operating system as well as unallocated space which is space that was previously controlled by the computer's operating system and which may still contain remnants or full copies of deleted files.

### A.    Mr. Regard's Initial Report.

In his first expert witness report dated November 17, 2014 (the "Initial Report"), Mr. Regard relied on a KGM email between Michael Yeager and Defendant McGinnis dated October 26, 2011 to establish that Defendant McGinnis possessed the password for KGM's BATCHOPS domain administrator account which provided access to certain KGM systems, shared drives, and storage networks.  These networks included an "H: Drive" containing files and folders which Mr. Regard was told by the SEC constituted Confidential Business Information ("CBI").

In authoring his Initial Report, Mr. Regard relied on the following additional facts:

a.    Mr. McGinnis had knowledge of how to use the BATCHOPS account since 2007, and there is email evidence confirming that knowledge throughout his tenure.

b.    Mr. McGinnis had access to several computers.

c.    The Internet history traces on GMCR36152 can be used to establish that the user on key dates knew the Facebook details for Mr. McGinnis.

d.    The SetupAPI information can be used to establish that the person using BATCHOPS on GMCR36152 shared a USB drive [serial number 57442D575833304137394133393630] with Mr. McGinnis via CHADMCLT.

---

[2] *See* Doc. 474-2 at 15 ("I cannot describe the differences of the three products.  I wasn't using the products hands-on; my team was.  I rely on their training and their expertise to bring out these artifacts.  I have examined the artifacts.  They have confirmed to me that they are reliable and I have interpreted them. . . .  I did not ask my subordinates why they chose the tools they chose in those cases.").

e.     The KGM building access records can be used to show that Mr. McGinnis was in KGM's building during the access dates and times of CBI folders and files.

f.     The ShellBag traces on GMCR36152 can be used to establish that the BATCHOPS account accessed CBI folders in the network, and folders on USB drives, at times and dates that correlate to other data sources, which indicate that the person accessing this information had the ability to use the Facebook account of Mr. McGinnis.

g.     The LNK file artifacts can be used to establish that (1) CBI files were copied from KGM servers and placed on USB devices (2) and renamed in such a way that they would appear innocuous.

Based upon his analysis of the four computers at issue, Mr. Regard opined as follows:

a.     Mr. McGinnis had broad access to the KGM network as a result of his knowledge of a domain administrator account;

b.     Using these domain administrator permissions, Mr. McGinnis accessed CBI folders on multiple occasions that would not have been accessible directly from his personally-assigned corporate account; and

c.     Mr. McGinnis viewed and copied CBI files to non-company owned external USB connected devices in a manner consistent with an intent to obfuscate his actions.

In Exhibit H to his Initial Report, Mr. Regard identified 136 specific access times over twenty-six days which he compared to other forensic artifacts to reach a conclusion that the user of GMCR36152 employed an external USB drive to copy and rename files "immediately before and after the folders were accessed[.]" (Doc. 474-1 at 30.) This opinion was based in part on Mr. Regard's analysis of ShellBags, which are forensic artifacts created by the Microsoft Windows operating system to record and track a computer user's preference for how folders are displayed onscreen in order to ensure continuity in the user's experience. At the *Daubert* hearing, Mr. Regard explained the use of ShellBags as follows:

> Initially when Windows is set up and a user account is created . . . in Windows XP, . . . Windows allocates space for ShellBags, but those ShellBag entries are blank. And then in the course of using the computer, as folders are interacted with, those ShellBag entries become populated. . . . So a ShellBag artifact[] . . . is . . . an entry into this Windows registry, also

5

called a hive, that tracks, once a folder's interacted with, what the name of
the folder is; where it's located; what its role is in terms of a hierarchy to
the extent that that's discernible; what the current settings are in the
operating system for that folder in terms of when it . . . date stamps as to
when it was first modified, when it was last accessed, [or] when it was
created[.]

(Doc. 501 at 39-40.)[3]

A ShellBag creates a limited record of interactions with certain folders which are
displayed onscreen in Windows Operating System in "folder trees." Because ShellBags
are displayed in "folder trees," a timestamp[4] for a parent folder may suggest that a user
interacted with a particular folder when in fact the user only interacted with a subfolder (a
"child folder") located in the same tree. Moreover, because timestamps are not "fixed,"
interactions within a folder tree can alter the timestamp associated with other folders in
that same tree. The timestamp associated with a particular ShellBag thus requires
verification and validation. This is done by a method commonly referred to in the
forensic field as "Zimmerman's ShellBag Rules" as they were first articulated by Eric R.
Zimmerman.

Mr. Regard's Initial Report addressed ShellBags from the live NTUSER.dat file.
He testified in his deposition that his team had identified prior NTUSER.dat versions in
unallocated space which were not relied on in the Initial Report because "the ShellBags
came from overlapping versions of NTUSER.DAT [so] there was no new information
there as to CBI folders being accessed." (Doc. 454-4 at 43.)

---

[3] In other words, when a Windows XP user interacts with a folder and indicates a preference (for
example, the use of a file name as opposed to an icon), the operating system records that
preference so that the next time the user interacts with the folder, he or she encounters the same
onscreen presentation. ShellBags primarily operates on the folder level as opposed to the file
level. Although Mr. Regard asserts that he found file-level activity in this case, he did not rely
on it for his opinions.

[4] ShellBag timestamps include when a folder was created, accessed, and modified ("MAC data").
When a ShellBag is created, the Windows operating system takes the MAC data for the folder
and stores it in the Registry for that ShellBag entry and adds a fourth date which is the Bagdate
or Registry date indicating when that entry was updated in the ShellBag Registry. These four
dates can be extracted using a forensic software tool such as EnCase.

At the time Mr. Regard issued his Initial Report, Dan Pullega had published a December 4, 2013 blog entitled "ShellBag Forensics: Addressing a misconception (Interpretation, step-by-step testing, new findings and more)" in which he cautioned that "[i]f a forensic investigator were to take the output of almost any ShellBag parser at face value, he/she would most likely misinterpret its meaning. This is because there is so much more to the artifact than it seems[]" and "[d]igital forensics investigation can be dangerous. One poor assumption can lead to several false accusations. Because of this, proper interpretation of forensic artifacts is paramount in any investigation." (Doc. 501 at 121-22) (internal quotation marks omitted). On October 1, 2014 in his blog, Mr. Pullega wrote: "Eric Zimmerman has released his new Windows GUI tool, ShellBags Explorer. It's my new go-to tool for ShellBags analysis. Download it here." *Id.* at 211. Mr. Zimmerman's ShellBags Explorer tool incorporated his ShellBag Rules. In addition to the tool itself, the ShellBags Explorer manual was released on November 21, 2014.

On April 14, 2014, Vincent Lo authored a white paper entitled "Windows ShellBag Forensics in Depth." On August 27, 2014, Magnet Axiom authored an article entitled "Forensic Analysis of Windows ShellBags" cautioning that:

> when examining the timestamp data, investigators should be conscious of the potential challenges looking at the ShellBag times of a particular artifact because many of these timestamps might (or might not) update in every scenario. Dan Pullega has done some excellent testing and analysis on these timestamps, and any investigator wishing to include this data in their analysis should read his work.

(Doc. 501 at 237) (internal quotation marks omitted).

In deposition, Mr. Regard acknowledged that "ShellBags have been in existence at least since Windows XP was released, and ShellBags have been first documented, I believe, in 2009 in terms of a widely distributed document." (Doc. 474-2 at 10.)

Prior to authoring his Initial Report, Mr. Regard received no formal training regarding ShellBag artifacts, did not author papers or other writings regarding ShellBags, and had not attended or provided any seminars or conferences regarding ShellBags. Mr. Regard testified that when he prepared his Initial Report, he "had not had the occasion to

deal with ShellBags. So I had not testified[;] I had not examined them previously; and my initial exposure to them was on this case." (Doc. 501 at 25.) The only research he performed was reading an unnamed article which "was the only article [he] looked at on ShellBags."[5] *Id.* at 236. In deposition, he conceded that his "personal familiarity" with regard to ShellBags prior to this case "was not high." (Doc. 474-2 at 10.)

Mr. Regard did not choose to analyze ShellBags, did not personally extract the ShellBags, and had not read the user's manual for one of his extraction tools which indicated the tool was experimental.[6] He did not examine the raw ShellBags data but instead saw it for the first time in an Excel spreadsheet. Mr. Regard was unaware of the "ShellBag Rules" until Defendants' expert witness brought them to his attention.[7] Although Mr. Regard testified to a forensic certainty that the ShellBag timestamps identified in Exhibit H to his Initial Report were accurate, he now concedes that "65 percent of those specific dates were not the correct date[]" (Doc. 474-8 at 5) because he failed to use Zimmerman's ShellBag Rules to validate them.[8]

---

[5] In deposition, Mr. Regard referred to reading an article by Zhu published in 2009 but he could not recall the article's title and did not identify the publication in which it could be found. He also could not summarize Mr. Zhu's conclusions with respect to ShellBag data.

[6] Mr. Regard's team used TZWorks to ascertain the location of a file identified as non-GAAP tables. The user manual, "TZWorks Windows Journal Parser Users Guide," states that "[a]fter some quick tests, surprisingly, there are a number of entries that are available and can be extracted successfully. We tried to tune the scanning to minimize false positives at the expense of missing some valid entries. While this adds a useful option, it should be considered experimental." (Doc. 501 at 191) (internal quotation marks omitted). Although he claimed the tool was reliable and extracted reliable data, he admitted that he did not know it was considered "experimental" and he conceded his opinions "need[ed] additional analysis," *id.* at 193, and that errors resulted because he "did not recheck [the results] against the master file table." *Id.* at 194.

[7] *See* Doc. 484 at 8 ("Q. You hadn't studied the literature in 2014 to make you aware of the items that Mr. Tarbell discussed in his report? A. I had not seen that literature. That is· correct.") (quoting Exhibit 3 at 266).

[8] The errors in the original Exhibit H to Mr. Regard's Initial Report were arguably detectable by a layperson. For example, the timestamps for June 3, 2014 indicate fourteen separate folders all accessed at the same time.

**B.    Mr. Regard's Supplemental Reports.**

On October 13, 2015, Mr. Regard authored a Supplemental Expert Report (the "2015 Supplemental Report") in which he opined that a USB device labelled "WD 2500BMV External USB Device" was used on GMCR36152 on April 17, 2013 to access a CBI folder named "\FINANCE\Private\IR\SEC Comment Letters\03_20_2013 Comment Letter 2012 10-K 1Q 2013 10-Q\" which file was stored on the WD 2500BMV External USB Device as "Restatement of Previously Reported Information Gudance.docx" (with the misspelling of "Guidance") and renamed "schmsvci70rest.docx." He opined that the WD 2500BMV External USB Device was also attached to Defendant McGinnis's personal computer, DELLXPS-PC, in addition to the GMCR36152 and CHADMCLT computers.[9]

On July 3, 2017, Mr. Regard authored a second Supplemental Expert Report (the "2017 Supplemental Report") wherein he asserted that since his Initial Report, "there have been major and minor improvements to the forensic tools [he] use[d]." (Doc. 459-9 at 4.) Mr. Regard claimed to have applied these newer tools in a supplemental analysis of CHADMCLT and to have "identified previously undetected evidence of [Defendant McGinnis's] use of the BATCHOPS user account, and previously undetected evidence of access to CBI on that same work-assigned laptop, as well as access to likely CBI on an unnamed work-assigned laptop that he used prior to CHADMCLT." *Id.* The court has previously found that the allegedly "new" evidence in the 2017 Supplemental Report was available when Mr. Regard issued his Initial Report and "advances in forensic technology were not necessary for Mr. Regard to perform his supplemental analysis." (Doc. 437 at 8.)

In the 2017 Supplemental Report, Mr. Regard offered the following opinions:

a.    The BATCHOPS domain account was found on the CHADMCLT laptop as the default user name for remote access to five different KGM computers.

---

[9] Both Mr. Regard and Mr. Tarbell found that a WD 2500BMV External USB Device was attached to DELLXPS-PC as well as to GMCR36152 and CHADMCLT. These opinions are not based exclusively on ShellBags analysis but are based on LNK file artifacts as well.

    b.     Files that matched the names of known KGM CBI were stored on the laptop identified as CHADMCLT used by Mr. McGinnis starting in November 2011.

    c.     Files that matched the names of known KGM CBI were renamed and subsequently deleted from the CHADMCLT laptop.

    d.     Preview images (or "thumbnails") of KGM PowerPoint presentations with titles of "Q3 2012 Performance," "June 2012 BOD Financial Update," and "Sept 2012 BOD Financial Update" were stored in the CHADMC user profile on the CHADMCLT laptop.

    e.     CHADMCLT contained traces of a laptop assigned to Mr. McGinnis prior to November 2011, CHADMCW7T. Those traces contain file names that match the naming style of known KGM CBI.

*Id.* at 4-5.

The gist of Mr. Regard's 2017 Supplemental Report was that based on his further analysis of CHADMCLT and its alleged predecessor computer, CHADMCW7T, a user of those computers had accessed KGM CBI in late 2011 and at various times during 2012 and demonstrated usage of BATCHOPS during 2012 and early 2013. He admits, however, that he erred in stating that "the BATCHOPS username and password was found in a deleted contact card that was once saved in Mr. McGinnis's GMCR mailbox[,]" as it was "actually in a deleted area of the mailbox itself." (Doc. 501 at 207) (internal quotation marks omitted).

On March 14, 2018, Defendants' expert witness, former FBI computer forensics analyst Christopher Tarbell of the Berkeley Research Group, issued his expert witness report in which he disagreed with Mr. Regard's reliance on timestamps derived from ShellBags and further disagreed that ShellBags could be used to indicate USB usage. Mr. Tarbell opined that the ShellBag timestamps as set forth in Exhibit H to Mr. Regard's Initial Report were approximately sixty-five percent inaccurate because he had failed to use Zimmerman's ShellBag Rules. Mr. Tarbell noted he had never worked with ShellBags prior to this case and asserted that the FBI's computer forensics team did not consider them reliable. In his deposition, Mr. Tarbell testified that he agreed that there was reliable forensic evidence that someone had used the BATCHOPS account on GMCR36152 to gain access to certain folders.

10

On or about May 30, 2018, Mr. Regard issued a Rebuttal Report (the "May 2018 Rebuttal Report") followed by a June 29, 2018 Rebuttal Report (the "June 2018 Rebuttal Report") wherein he disagreed with Mr. Tarbell's opinion regarding the reliability of ShellBags but admitted that Exhibit H to his Initial Report contained erroneous timestamps which he attempted to correct in a revised Exhibit H.[10]  In his Rebuttal Reports, he disagreed with Mr. Tarbell's conclusion that ShellBags did not indicate USB usage.  At the *Daubert* hearing, Mr. Regard explained the errors in Exhibit H to his Initial Report were caused because he "had not needed that level of detail for ShellBags previously[]" and he had not corrected them sooner because he "set aside" his opinions while this case was stayed.  (Doc. 501 at 75.)

In his Rebuttal Reports, Mr. Regard not only re-analyzed the ShellBag timestamps contained in his Initial Report but expanded his analysis to include ShellBags harvested from previous NTUSER.dat files in unallocated space, thereby expanding the entries from 136 to 546.  Instead of using EnCase to extract the NTUSER files, his team used X-Ways.  Mr. Regard concedes this forensic software tool was available to him in 2014.  In addition, Mr. Regard acknowledges that the NTUSER.DAT files located in unallocated space "would have been as available in 2014 as they are in 2018[]" and that he looked at those files in 2014 but decided not to include them in his Initial Report.  *Id.* at 111.  He nonetheless criticized Mr. Tarbell for not including this data in his expert witness report.[11]

---

[10] At the court's *Daubert* hearing, Mr. Regard conceded that errors remained in tabs three and four of the revised Exhibit H.  Mr. Regard explained that "[s]omeone on [his] team put it together at [his] direction[,]" (Doc. 501 at 139), that he validated it, but he had since found the errors.  He admits that the errors are readily apparent and that it is a "red flag" that he "missed[.]" *Id.* at 142.  He also conceded that he "did not go through every single piece of data line by line." *Id.* at 146.  Defendants identified 158 of the access times as incorrect or approximately forty-nine percent of the data.  In tab three of revised Exhibit H, the seconds of the timestamps were "inadvertently left off[]" *id.* at 74; this error is apparent from the face of the document.

[11] In his July 13, 2018 deposition, Mr. Regard was questioned as follows:

> Q So I believe in your Exhibit 13, May 2018 report, you fault Mr. Tarbell for not looking in the unallocated space; is that correct?

In his July 13, 2018 deposition, Mr. Regard was confronted with Mr. Tarbell's criticisms and admitted that Exhibit H to his Initial Report contained incorrect ShellBag timestamps, that an examiner must follow Zimmerman's Shellbag Rules to provide a valid analysis, and that he failed to follow those rules in his Initial Report.

At the court's *Daubert* hearing, Mr. Regard testified that when he rendered his Rebuttal Reports, he had worked with ShellBags for approximately five years. He cited an expert witness report and testimony in federal court he offered in 2015 relying in part on ShellBags to indicate the preservation or spoliation of data. He acknowledged that it was Mr. Tarbell's expert witness report, and not his independent research, review of the literature, or 2015 expert witness testimony, that caused him to re-examine his ShellBags opinions in this case.

## II.     Conclusions of Law and Analysis.

### A.     Whether Mr. Regard is Qualified to Serve as an Expert Witness and Whether his Opinions are Admissible.

Defendants challenge whether Mr. Regard is qualified to serve as an expert witness in this case, asserting that he is a "'push-button forensicator' . . . who relies solely on the output of software and then offers opinions without understanding the fundamentals of the forensics at issue." (Doc. 458-1 at 8.) The SEC counters that Mr.

---

A Yes, I do.

. . .

Q . . . [Y]ou say[]. . . "To the extent that Tarbell recovered these other artifacts, he's failed to include them in his report. To the extent he did not recover them, his work is deficient." Do you still maintain that his work is deficient if you didn't include the unallocated space NTUser files in your initial report that he was responding to?

A I think his work is less than it could have been. It was deficient. To that extent, my work could have been more as well back in 2014.

Q So you would use the same characterization of your 2014 report as deficient for not using the unallocated space?

A It wasn't as inclusive of the evidence as it could be, but that was a decision at the time based on time and budget and focus.

(Doc. 474-8 at 4.)

Regard is an experienced computer forensic analyst who has been previously qualified as an expert witness and who will assist the jury in understanding the information stored on computers associated with Defendant McGinnis.

"The proponent of expert testimony always bears the burden to show that his expert is qualified to testify competently regarding the matters he intend[s] to address[.]" *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (internal quotation marks omitted); *see also In re Pfizer Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) ("The proponent of the expert testimony has the burden to establish . . . admissibility requirements[]"). Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In applying Rule 702, the district court functions as the gatekeeper, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citing *Daubert*, 509 U.S. at 597) (internal quotation marks omitted). Whether a witness is qualified as an expert by his or her knowledge, skill, experience, training, or education is a "threshold question" that the court must resolve before determining whether his or her opinions are admissible. *Nimely v. City of New York*, 414 F.3d 381, 396 n.11 (2d Cir. 2005). "Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Daubert*, 509 U.S. at 590 (footnote omitted).

In determining the reliability of expert testimony, the district court must engage in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly

13

can be applied to the facts in issue." *Id.* at 592-93.  Relevant factors include "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593-94).  However, "the test of reliability is flexible, and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 644 (2018) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)) (internal quotation marks omitted).

Defendants argue that with regard to certain opinions, Mr. Regard strays into subject matters beyond his area of expertise, offers opinions based upon speculation or usurpation of the jury's role, and offers opinions which are not accepted in the forensic community or which have an unacceptable error rate.  The court addresses Defendants' challenges seriatim.

### 1.    Whether Mr. Regard May Opine Regarding CBI or MNPI.

Defendants argue that Mr. Regard should not be permitted to opine as to what constitutes CBI or MNPI.  The SEC acknowledges its duty to establish that certain folders and files in question contain MNPI and does not intend to ask Mr. Regard to make this determination, nor is he qualified to do so.  At trial, Mr. Regard may testify that he was asked by the SEC to investigate user interactions with certain folders and files.  In doing so, he shall refer to those folders and files by their names and shall not be permitted to opine whether they contain CBI or MNPI.

### 2.    Whether Mr. Regard May Opine Regarding Defendant McGinnis's Alleged Access to KGM's Building.

Defendants challenge Mr. Regard's opinion that Defendant McGinnis was in KGM's building at the time certain folders were accessed.  They point out that he cannot determine whether Mr. McGinnis used his KGM access card or whether someone else used it and cannot determine how long that person was in KGM's building.  Defendants

14

further contend that Mr. Regard's opinions in this area require no knowledge, skill, training, or education beyond that available to the average juror.

The SEC responds that it does not intend to ask Mr. Regard whether it was Defendant McGinnis or someone using his access swipe card. It also acknowledges that it must establish how and when KGM's building was accessed through a witness with personal knowledge of KGM's access system. It nonetheless argues that it will be helpful to the jury if Mr. Regard is allowed to draw a correlation between building access times using Defendant McGinnis's card and interactions with certain folders and files on computers associated with him.

An expert witness is permitted to offer an opinion that incorporates hypothetical facts provided the facts are established by the close of the evidence. *See Toucet v. Mar. Overseas Corp.*, 991 F.2d 5, 10 (1st Cir. 1993) (observing that "a hypothetical question should include only those facts supported by the evidence"); *Fluckey v. Chicago & Nw. Transp. Co.*, 838 F.2d 302, 303 (8th Cir. 1988) (same). In addition, an expert witness is not confined to facts known personally by him or her but may opine based on facts provided by others. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.").

In this case, it may assist the jury to understand the relationship, if any, between access to KGM's building and the dates and times when certain computer interactions occurred. As a result, although Mr. Regard may not opine that Defendant McGinnis was in KGM's building at a specific date and time, he may use an established fact that someone using Defendant McGinnis's swipe card entered the KGM building at a specific date and time as a factual context for his opinions.

### 3.     Whether Mr. Regard May Opine Regarding Defendant McGinnis's Alleged "Intent to Obfuscate."

Mr. Regard has opined that activities allegedly undertaken by a user of computers associated with Defendant McGinnis reflect the user's attempt to avoid detection. Defendants object that Mr. Regard is not qualified to render an opinion regarding a computer user's state of mind. *See Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435,

444 (2d Cir. 1995) (holding that an expert witness is precluded from "rendering opinions on subjects outside his field of expertise.").

Opinions regarding a person's motive or mental state are generally outside the ambit of proper expert witness testimony. *See Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) ("[W]e conclude that Dr. Greenstone's conclusory assertions regarding Carpenter's state of mind would not be helpful to a jury, [and] were not admissible[.]"); *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *8 (S.D.N.Y. Apr. 18, 2018) (ruling that "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony") (internal quotation marks omitted); *Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 187 (S.D.N.Y. 2008) (observing that expert witnesses may not "opine on a party's state of mind."). At trial, Mr. Regard is therefore precluded from opining as to the alleged motive underpinning certain computer activities. He may, however, testify regarding the activities themselves including any alleged file deletion, copying, and renaming.

### 4.   Whether Mr. Regard May Opine Regarding Thumbnail Cache Artifacts.

Prior to this case, Mr. Regard had not offered an expert witness opinion regarding thumbnail cache artifacts which are created and stored by the Windows operating system in the user's profile. The existence and purpose of thumbnail cache artifacts, however, is not subject to serious dispute in the forensic community:

> On ordinary computers running Windows operating systems, picture files are often stored in folders. When a folder is opened, the user has several options for displaying the pictures contained therein. One option is the "thumbnail" view. When the user selects the thumbnail view, a miniature version of each picture in the folder is displayed. Each of those miniatures is called a "thumbnail." The user can click on the thumbnail to open it and view a full-sized version of the picture. When the user selects the thumbnail viewing option, the Windows operating system automatically creates a hidden system file called "thumbs.db" within that folder. The user need not instruct Windows to do so; it happens automatically as part of the process of viewing the contents of the folder in thumbnail view. Thumbs.db is not a collection of many image files; it is a single file, which can be thought of as a visual catalog of all the image files contained in the

> folder. It contains a miniature, degraded version of every image in the
> folder that has been converted into a thumbnail pursuant to the use of the
> thumbnail view.

*Unites States v. Vosburgh*, 602 F.3d 512, 520-21 (3d Cir. 2010). A thumbnail cache
artifact is displayed as the first page of an image or document and indicates that at some
point a computer user interacted with that image or document even if it was subsequently
deleted.

In his 2017 Supplemental Report, Mr. Regard opined that thumbnail cache
artifacts found on a computer associated with Defendant McGinnis establish he
"browsed" certain PowerPoint files.[12] Mr. Regard has subsequently refined his use of the
term "browsed" to mean that "the user would have visited the locations where these files
were stored and allowed or enabled or triggered Windows to create and store these
thumbcache images." (Doc. 501 at 93.)

Mr. Regard is qualified in the field of computer forensics to render an opinion
regarding the nature and purpose of thumbnail images and explain their extraction and
use in this case. His opinions are within the scope of his expertise and are sufficiently
reliable to be considered by the jury. *See* Fed. R. Evid. 702.

### 5.    Whether Mr. Regard May Opine Regarding File Migration.

In his 2017 Supplemental Report, Mr. Regard opines that when Defendant
McGinnis "migrated from an old operating system to a new one on his work laptop,
certain files were present with names similar to files from folders that were identified to
him as confidential business information[.]" (Doc. 474 at 32.) He further opines that
"the existence of . . . 8 files in the change journal[13] located on [Defendant McGinnis's]
laptop . . . evidences that files with the names of KGM CBI were stored on the laptop and

---

[12] More specifically, he opines that "[t]he presence of these thumbnails on CHADMCLT under
the CHADMC profile is evidence that the original files they represent were at some time
browsed by the CHADMC user account[.]" (Doc. 501 at 205.)

[13] A Change Journal is a computer's systems file that records changes made within the
software's file system such as when a file is added, deleted, or renamed.

17

they were subsequently deleted." (Doc. 474-5 at 14.) He opines that the LoadState log[14] for GMCR36152 identified three matches to file names of files scheduled for migration through the user migration utility. He concludes that this constitutes evidence that files with those names had been on a KGM computer that Mr. McGinnis had used prior to his work laptop. He also found a record of files being deleted, which is captured in the normal course of business in the USN Journal which, similar to the LoadState log file, "tracks high-level information about individual files and folders" indicating the names of individual files which previously existed. (Doc. 501 at 91.) Because the files in question no longer existed, their contents could not be compared using their hash values.[15] This case is the first time Mr. Regard has offered an expert witness opinion regarding a LoadState log and Change Journal.

Defendants contend that Mr. Regard offers nothing more than a conclusory opinion that certain file names matched and certain files were or were not migrated which required no technical knowledge, education, skill, or training. The SEC counters that Mr. Regard used his expertise to identify, parse, and explain the migration logs and then applied common sense to identify files with similar names from artifacts that were chosen from a LoadState log which contains thousands of entries.

Because the court cannot assume that all jurors are conversant with how files are copied from one computer to another and the digital artifacts created in the process, Mr. Regard's explanation of this process and the files he focused on may be useful to the jury

---

[14] *See* Doc. 501 at 257-58 ("The LoadState log is a list of files that are scheduled to be copied from the source computer, computer one, to the destination computer, computer two. The LoadState log is written by the migration utility as a migration plan[.] These are the files that are planned to be migrated. When that migration actually takes place, when the plan is then executed, LNK files are confirmed to make sure that they are pointing to files that still exist. When those files that they point to don't exist and the files that they point to are not migrated, the LNK files are not migrated as well.").

[15] In the field of computer forensics, the contents of files are generally compared not by their names but by their hash value which is a unique numerical identifier generated by an algorithm by which the contents of two files can be compared. A hash value acts as a digital fingerprint. If the contents of two files are the same, they will bear the same hash value. It is not possible to use a hash value to compare files if the file contents are missing.

in analyzing the identity of the computer user and the files with which he or she interacted. *See Ambrosini v. Labarraque*, 101 F.3d 129, 135 (D.C. Cir. 1996) ("The dispositive question [under Rule 702] is whether the testimony will assist the trier of fact[,] . . . not whether the testimony satisfies the plaintiff's burden on the ultimate issue at trial.") (internal quotation marks omitted).

Mr. Regard's opinions are not subject to serious challenge on reliability grounds if they are properly cabined to omit reference to CBI or MNPI and if he is precluded from testifying regarding the contents of the files. To the extent Defendants challenge the accuracy of Mr. Regard's analysis, they may explore any deficiencies on cross-examination. *See Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) (quoting *Daubert*, 509 U.S. at 595) ("As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies[.]") (citation omitted); *see also Kumho Tire Co.*, 526 U.S. at 153 (observing that provided an expert opinion falls within "the range where experts might reasonably differ," the jury rather than the trial court should "decide among the conflicting views of different experts[.]").

### 6. Whether Mr. Regard is Qualified to Offer ShellBags Opinions.

Although Defendants seek exclusion of all of Mr. Regard's opinions, their focus is on his qualifications to render his ShellBags opinions. *See* Doc. 458-1 at 25 ("[W]hatever his experience with computer forensics generally, Regard's inexperience with *ShellBags* disqualifies Regard here."). Defendants' challenge to Mr. Regard's ShellBags opinions is four-fold: (1) at the time of his Initial Report, he lacked sufficient knowledge, skill, education, and training in ShellBags to qualify as an expert witness; (2) in rendering his ShellBags opinions, Mr. Regard served solely as a conduit for the work of his team which he did not direct, supervise, or validate and which he cannot replicate; (3) his ShellBags USB user opinion is not recognized as reliable in the field of computer forensics; and (4) because of the error rate in his initial ShellBags opinions and

19

the continuing errors in his revised opinions, his ShellBags opinions are unreliable and should be excluded pursuant to the court's gate-keeping function.

It is the SEC's burden to establish that Mr. Regard qualifies as an expert under Fed. R. Evid. 702 with regard to ShellBags before he may offer an opinion based thereon. Generalized qualifications as an expert in computer forensics will not suffice. *See Morse/Diesel, Inc.*, 67 F.3d at 444 (affirming that an expert witness is precluded from "rendering opinions on subjects outside his field of expertise."); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007) ("An expert qualified in one subject matter does not thereby become an expert for all purposes."). "A witness's qualifications can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 375 (S.D.N.Y. 2014) (internal quotation marks omitted).

Prior to his work in this case, Mr. Regard had not used ShellBags in any digital forensic analysis. He had not taught, published, or presented on ShellBags; he had authored no articles addressing ShellBags; and he had received no training with regard to them. He formed his ShellBags opinions solely for the purposes of this litigation. *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinion expressly for purposes of testifying"). Prior to rendering his opinions, he had read only one article, the title and contents of which he could not recall, that addressed ShellBags as a digital artifact.

Mr. Regard admits that when he authored his Initial Report he had a fundamental misunderstanding as to how to interpret and validate the ShellBags information presented to him by his team. He acknowledges his "interpretation of them was not accurate[,]" (Doc. 501 at 98), and that sixty-five percent of his timestamps were unreliable because he "did not know the rules at that time for interpreting those timestamps." *Id.* at 102. Although the SEC contends there was no error in Mr. Regard's team's ShellBags

extraction and his identification of ShellBags was "100% correct[,]" (Doc. 474 at 12), the magnitude of his error in their interpretation may, alone, be grounds to reject his ShellBags opinions. *See Daubert*, 509 U.S. at 594 (ruling that in deciding whether to admit expert testimony, "the court ordinarily should consider the known or potential rate of error[]" and concluding that an unacceptable error rate may be grounds for rejecting an opinion).

The SEC further points out that Vincent Lo's article on ShellBags was published two days after Mr. Regard's Initial Report.[16] It thereby suggests that Mr. Regard could not be expected to understand the ShellBag Rules at the time he authored his Initial Report. Defendants, in turn, point out that at the time of Mr. Regard's Initial Report there was sufficient published literature regarding Zimmerman's ShellBag Rules and a free, publicly available tool for extracting them.

An expert witness is expected to familiarize himself or herself with developments in the field in which he or she seeks to offer expert witness opinions and with respect to which he or she may testify at trial. Although the SEC is correct that the field of computer forensics is continuously evolving, it cannot establish that Mr. Regard was an expert witness in ShellBags at the time he authored his Initial Report.

Defendants argue that Mr. Regard's ShellBags opinions should be excluded for the further reason that he relied exclusively on the work performed by his team. In his 2015 deposition, Mr. Regard testified that he did not recall how his team decided to analyze ShellBags; he could not recite the ShellBag Rules; he did not extract the ShellBags himself or oversee their extraction; and he did not know what tools were used and why

---

[16] Mr. Regard's reliance on the ShellBags to indicate the use of a USB device is inconsistent with Mr. Lo's conclusions on which Mr. Regard relied in forming his initial ShellBags opinions. Mr. Lo has stated: "Windows XP does not create the ShellBag for folders on removable devices." (Doc. 501 at 255) (internal quotation marks omitted). In light of his lack of expertise in the area of ShellBags forensics, it is not enough for Mr. Regard to insist that he found ShellBags artifacts related to USB usage and claim that evidence is reliable. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (ruling that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

they were chosen to perform the extraction. He acknowledges that he did not choose the tools himself beyond approving the purchase of them for use in IDS's lab with regard to other assignments. In his deposition, Mr. Regard further admitted that he could not describe the differences between the forensic software tools his team used because he "wasn't using the products hands-on[,]" (Doc. 501 at 124), but rather was relying on his team's training and expertise. He acknowledges that he did not examine the raw output from the forensic tools, but rather had his team examine that data and provide it to him. He nonetheless agrees that "a forensic examiner's analysis . . cannot solely rely on findings from the results of automated software, so-called push-button forensics." *Id.* at 117.

"[A]n expert may certainly present the findings and conclusions of those whose work he or she supervised and that he or she could personally replicate if necessary." *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at \*22 (S.D.N.Y. July 28, 2017); *see also Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612 (7th Cir. 2002) ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify."). However, "a proffered expert may not simply pass off as their own, or serve as a vehicle for presenting, the opinions of others in subjects on which the proffered expert is not personally qualified." *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at \*22; *see also Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613 (observing that the "[a]nalysis becomes more complicated if the assistants aren't merely gofers or data gatherers but exercise professional judgment that is beyond the expert's ken."). Here, Mr. Regard did not direct, supervise, or control that extraction and has no apparent ability to replicate it. In his own words, he relied entirely upon his team to choose the software tools in question, to perform the extraction, and to express the data received. He identifies no expertise that he lent to that process or any analysis he engaged in beyond adopting his team's work.

The SEC argues that even if Mr. Regard's ShellBag timestamps and USB opinions are excluded, he should nonetheless be permitted to testify as to the existence of ShellBags in computers associated with Defendant McGinnis and to opine that their

existence indicates user interaction with certain folders. The problem with this approach is that it ignores that at the time of his Initial Report, Mr. Regard had no knowledge, experience, education, or training in ShellBags that would be helpful to a jury. His team's work and expertise cannot rectify that deficiency. Accordingly, it remains true that Mr. Regard was not qualified by knowledge, skill, experience, or training to render ShellBag opinions. *See* Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (internal quotation marks omitted).

### B.   Whether to Exclude or Strike Mr. Regard's Rebuttal Opinions.

Defendants seek to strike Mr. Regard's Rebuttal Reports on the grounds that they constitute improper new and corrected opinions in the guise of rebuttal. In the alternative, Defendants argue that Mr. Regard remains unqualified to render an opinion regarding ShellBags and his opinions on that subject matter should be excluded under *Daubert* and its progeny.

Defendants assert that Mr. Regard's Rebuttal Reports are an impermissible "do over" because they asked Mr. Tarbell to analyze only the live NTUSER.dat file because Mr. Regard's Initial Report confined its analysis to that data. Specifically, in his Initial Report, Mr. Regard evaluated GMCR36152's ShellBag registry keys found in the NTUSER.dat file and opined that there were 136 specific times when to a forensic certainty he concluded certain files were accessed. In deposition, he conceded that he relied only on the NTUSER.dat file even though he was aware that prior versions of the file could be recovered from unallocated space. He concedes the data in his Rebuttal Reports is different than the original Exhibit H to his Initial Report because it includes additional data extracted from additional locations.[17]

---

[17]    Q Can you explain the ways that the updated Exhibit H is different from what –
from what's been marked as Exhibit 10?

The SEC responds that Mr. Regard's Rebuttal Reports are a timely, non-prejudicial response to the opinions offered by Defendants' expert witness. The SEC contends that Mr. Regard did not examine any new data in rendering his Rebuttal Reports but merely examined all of the same NTUSER.dat files from 2014 and obtained different results because of new rules and new tools. It argues that the Rebuttal Reports are admissible because Mr. Regard has acquired additional knowledge and expertise in ShellBag analysis since his Initial Report.

In response to a series of agreed upon and contested requests for extensions in discovery, the court agreed that the SEC would be permitted to serve rebuttal expert witness reports but cautioned that such reports should be true rebuttal and not new opinions that could and should have been disclosed sooner. *See* Doc. 414 at 3 ("Although Defendants anticipate that the SEC may improperly disclose new opinions in its rebuttal reports, they may move to strike such opinions if this occurs."). In so ruling, the court was aware that Mr. Regard had already twice supplemented his opinions. Because at the time of the supplementation the case was in the discovery phase and a trial date had not been set, the court allowed it notwithstanding its conclusion that Mr. Regard's Supplemental Reports expanded his opinions based on technology and evidence available to him at the time of his Initial Report.

Fed. R. Civ. P. 26(a)(2)(B)(i)-(iii) requires an expert witness report to contain "a complete statement of all opinions the witness will express and the basis and reasons for them;" "the facts or data considered by the witness in forming them;" and "any exhibits

A . . . It's different in several ways and it's similar in several ways. It's similar in that it pulls ShellBag artifacts from GMCR36152 and represents those artifacts with more columns of information. It's different in that it pulls from more locations. And this original exhibit I pulled from one of the NTUSER.DAT files for BATCHOPS. In my revised exhibit, I was able to locate additional NTUSER.DAT files, historical copies, related to the same user account and was able to include those artifacts as well because there were times when those secondary or archived copies showed additional levels of detail.

(Doc. 501 at 65-66.) In response to the court's question, Mr. Regard agreed that this data was available in 2014, "the evidence has not changed," and the extraction tools existed but had improved. *Id.* at 68.

24

that will be used to summarize or support them[.]" Rule 26(e) requires "[a] party who has made a disclosure under Rule 26(a)[]" to "supplement or correct its disclosure . . . if the party learns in some material respect the disclosure . . . is incomplete or incorrect[.]" Fed. R. Civ. P. 26(e)(1)(A). If a party fails to supplement or correct, "the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Notwithstanding the duty to supplement or correct, an expert witness is not permitted to offer new opinions based on information that was previously available in the guise of a supplemental or rebuttal opinion. "Under Rule 26, an expert's report that does not rely on any information that was previously unknown or unavailable to him, should not be considered a supplemental report." *Faulkner*, 46 F. Supp. 3d at 378 (pointing out that "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions.") (internal quotation marks omitted). Expert rebuttal evidence is allowed if it "is intended solely to contradict or rebut evidence on the same subject matter identified by another party[.]" Fed. R. Civ. P. 26(a)(2)(D)(ii); *see also United States v. Casamento*, 887 F.2d 1141, 1172 (2d Cir. 1989) ("The function of rebuttal evidence is to explain or rebut evidence offered by the other party."). While it is "acceptable for an expert to use new methodologies in a rebuttal for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness[,]" *Allen v. Dairy Farmers of Am., Inc.*, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013) (internal quotation marks omitted), he or she may not offer new opinions that could and should have been included in an initial report.

Although "[t]rial judges have wide discretion in permitting the introduction of evidence in rebuttal which might well have been brought out in the . . . case in chief[,]" *United States v. Tejada*, 956 F.2d 1256, 1267 (2d Cir. 1992) (internal quotation marks omitted), in doing so they should not ignore the requirement that "[a] party present[] its arguments as to the issues for which it has the burden of proof in its initial expert report."

*Baldwin Graphics Sys., Inc. v. Siebert, Inc.*, 2005 WL 1300763, at \*2 (N.D. Ill. Feb. 22, 2005).[18]

Mr. Regard updated his analysis and findings between 2014 and 2018 at least twice without correcting the errors in his ShellBags analysis or expanding that analysis. He had been deposed and a partial summary judgment motion had been adjudicated by the time of his Rebuttal Reports. Trial dates have now been set and are imminent.

Because Mr. Tarbell confined his analysis to live NTUSER.dat file analyzed by Mr. Regard in his Initial Report, any rebuttal that Mr. Regard offered should have been similarly confined to the single NTUSER.dat file with regard to which he originally opined. *See Vu v. McNeil-PPC, Inc.*, 2010 WL 2179882, at \*3 (C.D. Cal. May 7, 2010) (observing that "[i]f the phrase 'same subject matter' is read broadly to encompass *any* possible topics that *relates* to the subject matter at issue, it will blur the distinction between 'affirmative expert' and 'rebuttal expert[]'" and would "render the scope of the subject matter limitless and will lead to unjust results[.]").

In light of the SEC's ample time, opportunity, and motive to expand the data and correct the mistakes in Mr. Regard's Initial Report, striking Mr. Regard's Rebuttal Reports to the extent they offer new opinions not offered in his Initial and Supplemental Reports is consistent with the applicable rules and avoids unnecessary and undue prejudice to Defendants. *See Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at \*5 (S.D.N.Y. Dec. 18, 2009) (striking a rebuttal report containing new test results where plaintiff's expert "could . . . have conducted those tests before his initial report was

---

[18] *See also In re President Casinos, Inc.*, 2007 WL 7232932, at \*2 (E.D. Mo. May 16, 2007) (noting "rebuttal expert testimony is limited to new unforeseen facts brought out in the other side's case" and "is not an opportunity for the correction of any oversights in the plaintiff's case in chief[]") (internal quotation marks omitted); *Byrd v. Aaron's, Inc.*, 2017 WL 1093286, at \*5 (W.D. Pa. Mar. 22, 2017) (ruling that a party cannot "us[e] rebuttal as a 'do-over' of an original report[]"); *Haskins v. First Am. Title Ins. Co.*, 2013 WL 5410531, at \*2 (D. N.J. Sept. 26, 2013) ("An expert's rebuttal report should be stricken if it contains new opinions or information which contradicts the expert's initial report[.]"); *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991) ("Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief[]" or a "more detailed and comprehensive explanation of earlier testimony").

drafted, and plaintiffs' gamesmanship in this regard is precisely what the Rules were intended to prevent.").

Even if Mr. Regard's rebuttal was confined to a criticism of Mr. Tarbell's conclusions, it remains questionable whether he is qualified to render expert witness opinions regarding ShellBags interpretation.  Mr. Regard admits that during the approximately three and a half years between his Initial Report and his Rebuttal Reports he did "not know [Zimmerman's ShellBag Rules]" and "had no occasion to need them[]" and had not "come across any articles on ShellBag interpretation while this case was pending[.]"  (Doc. 501 at 128.)  His expertise was developed solely because of and in response to an opposing expert witness's report and not because of any independent research he had conducted.  *See id.* at 241 ("[Mr. Tarbell's] analysis caused me to do more research."); *see also Toole v. Toshin Co.*, 2004 WL 2202580, at *3 (W.D.N.Y. Sept. 29, 2004) ("In assessing the reliability of an expert's methodology, the court should also consider whether the expert's opinion emanates from his own independent research[.]").  The ShellBags opinions in Mr. Regard's Rebuttal Reports are thus excluded for the further reason that the SEC has not established he is qualified to offer them under Fed. R. Evid. 702.

For the foregoing reasons, the court GRANTS Defendants' motion to strike Mr. Regard's Rebuttal Reports to the extent they offer opinions not contained in his Initial and Supplemental Reports (Doc. 454) and EXCLUDES the ShellBags opinions contained in each of his expert witness reports under Fed. R. Evid. 702.

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS IN PART AND DENIES IN PART Defendants' motions to strike (Doc. 454) and to exclude (Docs. 458 & 461) the opinions of the SEC's expert witness Daniel L. Regard II.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this __1st__ day of February, 2019.

Christina Reiss, District Judge
United States District Court