U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 FEB 19 PM 3: 16

CLERK

BY_____(AW)_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SECURITIES & EXCHANGE )
COMMISSION, )
 )
    Plaintiff, )
 )
v. ) Case No. 5:14-cv-6
 )
CHAD C. McGINNIS, )
SERGEY PUGACH, and )
JANUSZ SUCHOWIEJKO, )
 )
    Defendants, and )
 )
BELLA PUGACH, )
 )
    Relief Defendant. )

**OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO
EXCLUDE THE TESTIMONY OF C. PAUL WAZZAN**
(Doc. 455)

Pending before the court is the motion of Plaintiff Securities and Exchange Commission (the "SEC") to exclude the testimony of Defendants Chad C. McGinnis's and Sergey Pugach's expert witness C. Paul Wazzan, Ph.D. (Doc. 455.) Defendant McGinnis opposes the motion. The court assumes Defendant Pugach joins in that opposition.

I. **Factual and Procedural Background.**

The SEC asserts a claim that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, 15 U.S.C. § 78j(b), based on an alleged insider trading scheme involving the publicly traded stock of Keurig/Green Mountain Coffee Roasters ("KGM"). Between 2010 and 2013, the SEC alleges that Defendants traded in response to thirteen earnings announcements made by KGM where

Defendant McGinnis was employed from December of 2006 until his termination in July of 2013.

During his tenure at KGM, Defendant McGinnis worked as part of KGM's Information Systems and Technology Group. The SEC alleges that Defendant McGinnis accessed KGM's earnings announcements before they were released to the public, which constituted Material Non-Public Information ("MNPI") and that Defendant McGinnis disclosed the MNPI to Defendant Pugach who allegedly joined him in illegally trading in KGM stock based on the MNPI shortly after its receipt. The SEC alleges, in part, that the types of trades Defendants engaged in reveal that they were trading based on MNPI.

Defendants' expert witness, C. Paul Wazzan, has a Ph.D. in Finance from the University of California, Los Angeles, and a Bachelor of Economics from the University of California, Berkeley.[1] He is the Senior Managing Director at FTI Consulting, Inc. in the Forensic and Litigation Consulting division. He specializes in providing financial, economic, and statistical expertise in the areas of complex damages; finance, including valuation, corporate finance, securities fraud, and option valuation; intellectual property; labor and employment; antitrust; and public policy. He has previously testified in federal court as an expert on finance issues including securities and options. The Department of Justice has retained him as an expert witness on two occasions.

Dr. Wazzan's assignment in this case was to "evaluate trading data for the days leading up to each of the at-issue earnings announcements to determine whether other traders entered into strangles and to quantify, if possible, the number of such transactions." (Doc. 455-3 at 8.) In the course of his assignment, he analyzed trading

---

[1] In his doctoral dissertation, *The Impact of Earnings Announcements on Market Liquidity and Price Discovery: An Intraday, Multi-Market Analysis*, which was published in 1996 by the University of California, Los Angeles Department of Finance, Dr. Wazzan analyzed similar data at issue in this case. *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.").

data leading up to the thirteen earnings announcements contained in blue sheet data[2] which was provided by the SEC.

Dr. Wazzan defines "strangles" as the purchase of out-of-the-money[3] call[4] and put[5] options of the same underlying stock. A strangle has the same trading date, although it could have different expiration dates and the number of call and put options could be different. Dr. Wazzan defines an "unbalanced strangle" as the purchase of both out-of-the-money KGM call and put options with the same expiration date, on the same trading date. He defines a "balanced strangle" as the purchase of the same number of out-of-the-money KGM call and put options, with the same expiration date, on the same trading date. Dr. Wazzan coined the balanced and unbalanced distinction. In deposition, Dr. Wazzan testified that strangles are used "typically when you expect large movements in

---

[2] "Blue [s]heet data files, which contain both trading and account holder information, provide regulatory agencies with the ability to analyze a firm's trading activity. Firms are expected to provide complete, accurate and timely [b]lue [s]heet data in response to regulatory requests. Incomplete, inaccurate and untimely [b]lue [s]heet data compromises regulators' ability to identify individuals engaging in insider trading schemes and other fraudulent activity." (Doc. 455-2 at 6) (internal quotation marks omitted). Dr. Wazzan used the blue sheet data fields which describe the characteristics of a particular trade: trade date; call put indicator; buy sell description; SEC calc expiration date; SEC calc strike price; and individual quantity. In deposition, Dr. Wazzan could not recall any other instances in which he used blue sheet data although he believed he had seen it in previous cases and may have used it in *Johns Wu v. Bank of New York Mellon, N.A.*, a 2016 case from the Superior Court of California, Los Angeles County. The SEC relies on blue sheet data in its own investigations of potential insider trading.

[3] "A call option is out-of-the-money when the stock price is lower than the exercise price. A put option is out-of-the-money when the stock price is higher than the exercise price." (Doc. 455-2 at 4 n.4.)

[4] Call options and put options are types of options traders can purchase for stocks. A call option gives the purchaser the right to buy 100 shares of an underlying stock at a specific price, the "exercise" or "strike" price.

[5] A put option gives the purchaser the option to sell 100 shares of an underlying stock at the strike price.

3

the underlying stock price, but you don't know under which directions it's going to go in." (Doc. 455-3 at 11.)[6]

Dr. Wazzan's March 18, 2018 expert witness report (the "Report") offers the following opinions:

 a. "A strangle is a commonly used trading strategy that aims to be neutral on direction, while exploiting increases in volatility." (Doc. 455-2 at 5.)

 b. At least 2,600 individual traders engaged in strangles over seventy-four trading days between November 12, 2010 and May 9, 2013 (the "sample time period").

 c. At least 2,400 individual traders engaged in unbalanced strangles during the sample time period.

 d. At least 1,700 individual traders engaged in balanced strangles during the sample time period.

 e. Market commentators noted KGM volatility and recommended strangles using KGM options during the 2010 to 2013 time period.

In his Report, Dr. Wazzan explains that he received the blue sheet data from the SEC and then "cleaned" the data by consolidating account numbers which were the same except for the last digit and by standardizing and consolidating short names in order to identify how many unique traders employed strangles. (Doc. 455-2 at 7.) Dr. Wazzan's team then designed a computer code which searched the cleansed data and found the number of unique traders who engaged in strangles on a specific day, as well as the number of unique traders engaged in strangles during the sample time period. The data was further analyzed to determine the number of daily unique traders who engaged in unbalanced and balanced strangles. Dr. Wazzan relied on Mr. Mayer's December 9, 2014 expert witness report in rendering his opinions. Dr. Wazzan acknowledges that the code he used did not eliminate trades that were made in both directions in the course of a single trading day.

---

[6] The SEC's expert witness, Michael G. Mayer, defines a strangle as "an options strategy where the investor holds a position in both a call and put with different strike prices but with the same maturity and underlying asset." (Doc. 460-3 at 14.)

4

## II. Conclusions of Law and Analysis.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue an expert may testify thereto." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (emphasis and internal quotation marks omitted). "Proposed testimony must be supported by appropriate validation—*i.e.*, 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590. Relevant factors include "the theory's testability, the extent to which it 'has been subjected to peer review and publication,' the extent to which a technique is subject to 'standards controlling the technique's operation,' the 'known or potential rate of error,' and the 'degree of acceptance' within the 'relevant scientific community.'" *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015) (quoting *Daubert*, 509 U.S. at 593-94).

"Rule 702 further requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 591 (internal quotation marks omitted). In applying Rule 702, the district court functions as the gatekeeper, ensuring "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citing *Daubert*, 509 U.S. at 597) (internal quotation marks omitted). "The consideration has been aptly described . . . as one of 'fit.' 'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591 (citation omitted).

Although expert witness testimony must be scrutinized for admissibility in light of the weight a jury may accord it, minor deficiencies in an expert witness opinion from a qualified witness who offers opinions with the requisite fit do not mandate exclusion of the entire opinion. *See id.* at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Moreover, "*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to

the judge that the expert's assessment of the situation is correct." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998).

### A. Dr. Wazzan's Strangles Opinions.

#### 1. Whether Dr. Wazzan May Opine Regarding the Nature of a Strangle.

Because the nature and existence of a strangle as a trading strategy is not subject to serious dispute and may be beyond the ken of the average juror, under Fed. R. Evid. 702, Dr. Wazzan may opine regarding the nature of strangles, including his balanced/unbalanced distinction (provided he discloses its provenance). As Defendant McGinnis points out, once a jury understands the nature of a strangle, it may find that "trading bi-directionally[] in order to benefit from a price movement regardless of the direction the stock moves[] is fundamentally inconsistent with [possession of] material nonpublic information about a company's earnings." (Doc. 477 at 5.) Dr. Wazzan may not, however, further opine that strangles are "common" trading strategies as he conceded in deposition that he could not quantify either how often strangles are employed or the percentage of traders who use them.

#### 2. Whether Dr. Wazzan May Opine Regarding Strangle Counts.

The SEC seeks to exclude Dr. Wazzan's testimony regarding the number of unique traders who engaged in strangles during the sample time periods, arguing that his analysis is not reliable and lacks the requisite "fit" under Fed. R. Evid. 702 because he lacks familiarity with the relevant data in this case and relies exclusively on the blue sheet data.[7] The SEC further asserts that Dr. Wazzan's opinions should be excluded under Fed. R. Evid. 403 because they are not relevant to a contested issue as he has no knowledge of Defendants' trading strategies and because Defendants' other expert Gregg

---

[7] As Defendant McGinnis points out, the SEC's own expert witness on trading agrees with Dr. Wazzan's strangle calculations, found no flaws in Dr. Wazzan's process for reviewing blue sheet data, and relied on the blue sheet data for his own rebuttal opinions.

A. Jarrell will also testify as to strangles. The SEC does not challenge the accuracy of Dr. Wazzan's statistical findings.[8]

Defendants offers Dr. Wazzan's testimony to place their trading activities in context and "[u]ndercut" the SEC's allegation that their trading was suspicious. (Doc. 477 at 17.) Dr. Wazzan essentially opines that thousands of other traders, not employed by KGM, engaged in strangles at the same time as Defendants thereby creating a reasonable inference that those trades were market as opposed to MNPI driven.

Dr. Wazzan's reliance on the blue sheet data to perform his analysis was proper as it was provided by the SEC, the SEC's own expert witness uses it to form his rebuttal opinions, and the SEC uses blue sheet data as part of its own insider trading investigations. The reliability of blue sheet data for Dr. Wazzan's analysis is thus sufficiently established to pose no barrier to the admissibility of Dr. Wazzan's opinions based thereon. Any deficiencies in the data or failure to cross-check the data against other sources may be explored in cross-examination. *See Ruiz-Troche*, 161 F.3d at 85 ("As long as an expert's scientific testimony rests upon good grounds, based on what is known, it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies[.]") (citation and internal quotation marks omitted).

Dr. Wazzan analyzed strangles surrounding thirteen KGM earnings announcements; this was both proper and sufficiently tied to a contested issue. The KGM earnings announcements at issue were chosen by the SEC as part of its claims in this case and relied upon by the SEC's expert witness in rendering his opinions. Dr. Wazzan's opinions thus offer the requisite fit with Defendants' trading activity.

For those earning periods for which Defendants did not employ a strangle, the fit is more tenuous. At most, Dr. Wazzan's analysis serves to demonstrate that a multitude

---

[8] Dr. Wazzan revised his initial expert witness report when he realized he lacked options data for the November 20, 2012 trading period. The SEC was apparently unaware that it had omitted that data.

of strangles were used over the relevant time period. This supports Defendants' contention that their use of strangles is not inherently suspicious. The risk of confusing the jury regarding earnings announcements for which Defendants did not themselves employ a strangle may be eliminated by direct and cross-examination which makes this distinction clear.

The SEC's criticism that Dr. Wazzan failed to determine which trades in his data set were made by institutional traders may also be addressed through cross-examination. Although the SEC contends that institutional traders are not proper comparators for Defendants, Dr. Wazzan disagrees and will be permitted to opine as to why they are, which may open the door to the SEC establishing through its own expert witness why they are not. *See* Fed. R. Evid. 703 (permitting expert witness testimony based upon facts or data made known to the expert at trial).

The SEC points out that the way Dr. Wazzan's code searched for strangles could have resulted in the inclusion of trades in his data set which were not strangles according to his own definition. Specifically, the SEC observes that Dr. Wazzan defines a strangle as a trade that was out-of-the-money when it was made, but his code could have picked up trades which were not out-of-the-money when they were made at the beginning of a trading day but became out-of-the-money by its end. In his deposition, Dr. Wazzan testified that while it was possible his code picked up trades of this nature, the stock price of KGM was unlikely to have vacillated in a single day with sufficient frequency to render his analysis wholly inaccurate. Again, any weaknesses in this assumption may be explored on cross-examination. *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[C]ontentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony.") (internal quotation marks omitted).

The SEC further asserts that Dr. Wazzan's testimony should be excluded because his strangle counts do not consider the entirety of each unique trader's portfolio and therefore Dr. Wazzan cannot state with any authority that the strangles are intended to be neutral on direction. It argues that in order for Dr. Wazzan's opinions to be admissible, he needed to analyze each unique trader's portfolio during the relevant time periods in

8

order to opine regarding that unique trader's strategies. The SEC cites no authority for this sweeping proposition which, if adopted by the court, would foreclose a broad spectrum of data based upon the assumption that no trade can be analyzed in isolation and each trader's entire trading record over the time period must be considered in order for it to be an adequate comparator. Because Dr. Wazzan appropriately tailored his analysis to ensure reasonably reliable results, his opinions are not inadmissible merely because the SEC can identify contingencies not addressed by them. *See Amorgianos*, 303 F.3d at 267 ("A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible. The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions.") (internal quotation marks omitted).

Finally, the SEC seeks to exclude Dr. Wazzan's opinions regarding strangles on the basis that they are unnecessary and cumulative. The SEC observes that Defendants can testify about their own trading strategies while Dr. Jarrell can testify about strangles. Defendants are entitled to rebut the SEC's characterization of their trading as suspicious with both their own lay testimony and the testimony of an expert witness. *See Bartlett v. Mut. Pharm. Co.*, 759 F. Supp. 2d 171, 213 (D.N.H. 2010) ("Each witness, though, had something different to add. . . . No single witness, even [Plaintiff] herself, could have given the jury a full picture of what happened."); *Johnson v. United States*, 780 F.2d 902, 906 (11th Cir. 1986) (admitting expert witness testimony despite testimony of other expert witnesses because it was "more comprehensive" and "therefore, at least partially non-cumulative"). Dr. Wazzan's statistical findings and related opinions are different from those of Dr. Jarrell and provide a context based on specialized knowledge which may be helpful to the jury, rendering Dr. Wazzan's testimony non-cumulative.

Because Dr. Wazzan is qualified to offer his opinions regarding strangles and his opinions may assist the jury in deciding contested issues regarding the nature of Defendants' trading in KGM stock around certain events, the SEC's motion to exclude Dr. Wazzan's opinions on strangles is DENIED.

9

### B. Whether Dr. Wazzan May Opine that Market Commentators Recommended Strangles for KGM.

Defendants seek to have Dr. Wazzan opine that market commentators recommended traders engage in strangles using KGM options during the relevant time period. The SEC seeks to exclude this opinion because it is inadmissible under Fed. R. Evid. 702 and is an inappropriate attempt to introduce hearsay.

In his Report, Dr. Wazzan opines that: "Market commentators noted [KGM] volatility and recommended strangles using [KGM] options during the 2010-2013 time period." (Doc. 455-2 at 5.) In support of this proposition, he cites two articles from a website called "Seeking Alpha" dated September 21, 2012 and September 24, 2012, respectively. *Id.* In his deposition, Dr. Wazzan testified his staff had "looked for this type of information, and that's what they found." (Doc. 455-3 at 13.) He, however, conceded that the September 21, 2012 article does not mention strangles. The September 24, 2012 article states that its author intended to purchase October 2012 calls and puts in KGM because, regardless of direction, he expected KGM stock values to move significantly.

The SEC's expert witness, Mr. Mayer, has testified that it was commonly known during the relevant period that KGM was a volatile stock. Dr. Wazzan may offer the jury this same opinion. He may not, however, go further and identify an article which Defendant McGinnis never read or relied upon and then assert that strangles were advised by market commentators regarding KGM stock. In that respect, the article is offered for its truth. *See* Fed. R. Evid. 801(a), (c)(2) (defining hearsay as a "written assertion" that "a party offers in evidence to prove the truth of the matter asserted in the statement"); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("The Federal Rules of Evidence define hearsay as a declarant's out-of-court statement offered in evidence to prove the truth of the matter asserted in the statement.") (alteration and internal quotation marks omitted). While an expert witness may rely on hearsay in forming an opinion, *see* Fed. R. Evid. 703, a single article by an author of unknown reliability can hardly be said

to represent the state of guidance in the market upon which Dr. Wazzan bases an entire opinion. Under *Daubert* and its progeny, the requisite fit is lacking.

If the article is offered for its effect on Defendant McGinnis's state of mind, there must be a factual predicate which establishes that Defendant McGinnis actually read and considered it. No such factual predicate has been established. As a result, there is "simply too great an analytical gap between the data and the opinion proffered" to permit Dr. Wazzan to suggest that the guidance contained in this article was akin to common knowledge which must have reached Defendant McGinnis. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 48 (E.D.N.Y. 1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.") (internal quotation marks omitted). Dr. Wazzan may thus not opine at trial that market commentators or even a single market commentator recommended strangles for KGM stock during the relevant time period.

## CONCLUSION

For the foregoing reasons, the court hereby GRANTS IN PART AND DENIES IN PART the SEC's motion to exclude Defendants' expert witness C. Paul Wazzan. (Doc. 455.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of February, 2019.

Christina Reiss, District Judge
United States District Court